**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STEPHEN M. SCIANNELLA, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2023-0125-PAF |
| ASTRAZENECA UK LIMITED, ASTRAZENECA PLC, TYRELL RIVERS, PH.D., PASCAL SORIOT, ZHENGBIN YAO, PH.D., EDWARD HU, YANLING CAO, ANDREAS WICKI, CHRIS NOLET, and RACHELLE JACQUES, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Date Submitted: January 25, 2024
Date Decided: July 8, 2024

Kimberly A. Evans, Lindsay K. Faccenda, Irene R. Lax, Robert Erikson, BLOCK & LEVITON LLP, Wilmington, Delaware; Christopher H. Lyons, Tayler D. Bolton, ROBBINS GELLER RUDMAN & DOWD LLP, Wilmington, Delaware; Randall J. Baron, David A. Knotts, Teo A. Doremus, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Brett M. Middleton, JOHNSON FISTEL, LLP, San Diego, California; *Attorneys for Plaintiff Stephen M. Sciannella.*

Kevin M. Gallagher, Nicole M. Henry, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; John F. Sylvia, Kerime S. Akoglu, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., Boston, Massachusetts; *Attorneys for Defendants Zhengbin Yao, Ph.D., Edward Hu, Yanling Cao, Andreas Wicki, Chris Nolet, and Rachelle Jacques.*

Daniel M. Silver, Benjamin A. Smyth, Sarah E. Delia, Alexandra M. Joyce, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Meredith Kotler, Mary Eaton, Nicholas A. Caselli, FRESHFIELDS BRUCKHAUS DERINGER US LLP,

New York, New York; *Attorneys for Defendants AstraZeneca UK Limited, AstraZeneca plc, Tyrell Rivers, Ph.D., and Pascal Soriot.*

**FIORAVANTI, Vice Chancellor**

In this putative class action, a former stockholder of Viela Bio, Inc. ("Viela" or the "Company") alleges the directors, officers, and former parent of the Company breached their fiduciary duties in selling the Company to affiliates of Horizon Therapeutics plc ("Horizon") in 2021 for $53.00 per share. The transaction was structured as a tender offer followed by a merger. The plaintiff alleges that AstraZeneca plc and AstraZeneca UK Limited (collectively, "AstraZeneca"), which owned 26.7% of Viela's outstanding common stock, controlled Viela and pushed for a quick sale of the Company so that AstraZeneca could facilitate its acquisition of Viela's rival.

AstraZeneca has moved to dismiss under Court of Chancery Rule 12(b)(2), arguing that it is not subject to personal jurisdiction in Delaware. In addition, all of the defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. AstraZeneca argues that it was not a controlling stockholder and, therefore, owed no fiduciary duties to the plaintiff or Viela stockholders. The individual defendants argue that the complaint must be dismissed because a majority of Viela's disinterested stockholders tendered their shares in an uncoerced and fully informed tender offer, subjecting the transaction to business judgment review under *Corwin v. KKR Financial Holdings LLC*, 125 A.3d 304 (Del. 2015).

1

In opposing the motions to dismiss, the plaintiff argues that AstraZeneca is subject to personal jurisdiction because Viela designated Delaware as the exclusive forum for litigation such as this case at a time when AstraZeneca controlled the Company. The plaintiff also insists that *Corwin* is inapplicable for two reasons. First, he argues that the transaction is subject to review under the entire fairness standard because AstraZeneca was Viela's controlling stockholder and pushed the Company into the transaction so that AstraZeneca could acquire Viela's direct competitor. Second, he contends that a majority of stockholders that tendered their shares were not fully informed because the recommendation statement that the board disseminated to stockholders for the transaction was materially misleading and omitted material information.

For the reasons that follow, the court concludes that the complaint fails to plead facts to support a reasonable inference that AstraZeneca was a controlling stockholder at the time of the transaction and, therefore, did not owe fiduciary duties to the plaintiff or Viela stockholders. The court further concludes that the complaint fails to allege that the recommendation statement was materially misleading or omitted material facts. Therefore, under *Corwin*, the transaction is subject to business judgment review, and the complaint must be dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim.

## I.    BACKGROUND

The following recitation of the facts is drawn from the Verified Complaint (the "Complaint"),[1] the documents integral thereto, and public filings subject to judicial notice.[2]

---

[1] Citations to the docket in this action are in the form of "Dkt. [#]." In citations, the Complaint in this action, Dkt. 1, will be cited as "Compl." After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

[2] The Complaint incorporates by reference documents filed with the U.S. Securities and Exchange Commission (the "SEC"). The court may take judicial notice of these documents on a motion to dismiss. *In re Santa Fe Pacific S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995). Exhibits attached to the Complaint are cited as "Ex." Exhibits entered into the record by AstraZeneca are cited as "AZ Defs.' Ex." Exhibits entered into the record by the Non-AZ Directors (defined below) are cited as "Director Defs.' Ex." Plaintiff objected that Defendants have introduced into the record extraneous documents produced to Plaintiff in response to a books and record demand under 8 *Del. C.* § 220. *See* Pl.'s Answering Br. 80–81. The Complaint, however, references documents from the § 220 action. *See, e.g.*, Compl. ¶¶ 14, 15, 88–91. The parties also stipulated that the documents from the § 220 action are incorporated by reference into the Complaint. AZ Defs.' Ex. 60 ¶ 15. The court is permitted to consider these documents on a motion to dismiss. *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (internal quotation marks omitted)), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). While the court may consider documents produced pursuant to a § 220 demand that the parties have agreed to incorporate by reference into an ensuing complaint, the incorporation by reference doctrine does not "change the pleading standard that governs a motion to dismiss." *Id.* at 798. "If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiff makes a well-pleaded factual allegation, then the allegation will be credited." *Id.* The plaintiff is also entitled to all reasonable inferences. "[I]f a document or the circumstances support more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference." *Id.*

3

## A. Parties and Relevant Participants

Plaintiff Stephen M. Sciannella ("Plaintiff") was a stockholder of Viela prior to its acquisition by Horizon.[3]

Defendant AstraZeneca UK Limited ("AstraZeneca UK") is a wholly owned subsidiary of AstraZeneca plc and is headquartered in Cambridge, England.[4] AstraZeneca UK focuses on the discovery, development, manufacturing, and commercialization of medications.[5] AstraZeneca UK owned 26.72% of Viela's outstanding common stock immediately prior to Horizon's acquisition of Viela.[6]

AstraZeneca UK's parent, Defendant AstraZeneca plc, is a public company headquartered in Cambridge, England.[7]

Prior to the transaction, Viela was a biotechnology company headquartered in Gaithersburg, Maryland, focused on the discovery, development, and commercialization of novel treatments for autoimmune and severe inflammatory diseases.[8] Horizon, a biopharmaceutical company headquartered in Ireland, focuses on researching, developing, and commercializing medicines addressing rare and

---

[3] Compl. ¶ 25.

[4] *Id.* ¶ 26.

[5] *Id.*

[6] *Id.*

[7] *Id.* ¶ 27.

[8] *Id.* ¶ 39.

rheumatic diseases.[9]   Horizon acquired all outstanding stock in Viela in the transaction.[10]

Defendants Pascal Soriot, Tyrell Rivers, Ph.D., Zhengbin Yao, Ph.D., Edward Hu, Yanling Cao, Andreas Wicki, Chris Nolet, and Rachelle Jacques all served as members of Viela's board of directors (the "Board").

Soriot was CEO of AstraZeneca plc at all relevant times and served on the Viela Board from January 2019 until his resignation on September 18, 2020.[11]

Rivers was an executive director in AstraZeneca's Corporate Development group at all relevant times and served on the Viela Board since February 2018.[12]

Yao served as Viela's CEO between March 2018 and April 2021 and as chairman of the Board from January 2019 to April 2021.[13]  Prior to his role at Viela, Yao served as Senior Vice President, Research & Development, Head of Respiratory, Inflammation and Autoimmunity, and Senior Vice President, Head of Immuno-Oncology Franchise at AstraZeneca.[14]

---

[9] *Id.* ¶ 40.

[10] *Id.* ¶ 2.

[11] *Id.* ¶ 31; AZ Defs.' Ex. 7 at 157.

[12] Compl. ¶ 29; AZ Defs.' Ex. 7 at 157.

[13] Compl. ¶ 32; AZ Defs.' Ex. 7 at 157.

[14] Compl. ¶ 32.

Hu, Cao, Wicki, Nolet, and Jacques (the "Non-AZ Directors") did not hold positions at either Viela or AstraZeneca.[15]

## B. AstraZeneca Spins-Off Viela

AstraZeneca created Viela in February 2018.[16] At that time, MedImmune LLC ("MedImmune"), a Delaware limited liability company and wholly owned subsidiary of AstraZeneca, functioned as AstraZeneca's research and development arm for biologics.[17] In creating Viela, AstraZeneca contributed six MedImmune molecules in exchange for Viela stock.[18] Viela also received cash from new investors, who likewise received stock in the Company.[19] AstraZeneca placed five of its former executives in top management positions at Viela, including Yao as Viela's CEO and Jörn Drappa as Viela's Head of Research & Development and Chief Medical Officer.[20] AstraZeneca also selected Rivers and Soriot to join the Board in February 2018 and January 2019, respectively.[21]

---

[15] *See id.* ¶¶ 33–37.

[16] *Id.* ¶ 4.

[17] *Id.* ¶ 41 n.2. On February 14, 2019, AstraZeneca retired the MedImmune name and has since then referred to any former MedImmune related efforts as AstraZeneca's. *Id.*

[18] *Id.* ¶ 41.

[19] *Id.* ¶¶ 41, 57.

[20] *Id.* ¶ 41.

[21] *Id.* ¶ 4; AZ Defs.' Ex. 7 at 157.

As part of the spin-off, Viela entered into an asset purchase agreement with MedImmune and certain affiliates of AstraZeneca on February 23, 2018 (the "APA").[22] Under the APA, Viela acquired the intellectual property and biological, regulatory, and other materials associated with the six MedImmune molecules for approximately $142 million, financed by the sale of preferred stock to AstraZeneca.[23] Among the six molecules spun off to create Viela was inebilizumab, a product developed and ultimately approved to treat neuromyelitis optica spectrum disorder ("NMOSD"), a rare neuroinflammatory disease.[24] The inebilizumab molecule was commercialized under the brand name, "UPLIZNA."[25] The U.S. Food and Drug Administration ("FDA") had granted UPLIZNA Orphan Drug Designation in February 2016.[26]

Pursuant to the APA, Viela entered into a series of commercial agreements with AstraZeneca and certain of its affiliates, including: (1) a license agreement (the "License Agreement"); (2) a clinical supply agreement (the "Clinical Supply Agreement"); (3) a master supply and development services agreement (the "MSDSA"); (4) a transition services agreement (the "TSA"); and (5) a commercial

---

[22] *See* AZ Defs.' Opening Br. viii, 7; AZ Defs.' Ex. 7 at 122.

[23] AZ Defs.' Ex. 7 at 101, 122, 172.

[24] *See* Compl. ¶¶ 70–71; AZ Defs.' Ex. 7 at 99, 108–09.

[25] Compl. ¶ 18 n.1.

[26] AZ Defs.' Ex. 7 at 99.

supply agreement (the "Commercial Supply Agreement," and together with the License Agreement, the Clinical Supply Agreement, the MSDSA, and TSA, the "Support Agreements").[27]

### 1. The License Agreement

Under the License Agreement, MedImmune granted Viela an exclusive license to use certain patented methods to develop, commercialize, and sell the six molecules.[28] The License Agreement would not expire, by its terms, until the "expiration, revocation, invalidation or abandonment of the last patent or patent application" within the licensed patents, at which time the licenses would become nonexclusive and irrevocable.[29] Viela had the right to terminate the License Agreement for convenience upon 60 days' notice to MedImmune.[30]

### 2. The Clinical Supply Agreement

The Clinical Supply Agreement provided that AstraZeneca would furnish a clinical supply of UPLIZNA and matching placebo for Viela's use in clinical testing, along with shipping and distribution services and regulatory support.[31] The Clinical Supply Agreement had a five-year term and automatically renewed for successive

---

[27] Compl. ¶ 44.

[28] AZ Defs.' Ex. 4 § 2.1 [hereinafter "License Agreement"]; Compl. ¶ 44(a).

[29] License Agreement § 6.1.

[30] *Id.* § 6.2.4.

[31] AZ Defs.' Ex. 1 §§ 2.1, 2.3, 2.5 & Schedule 1 [hereinafter "Clinical Supply Agreement]; Compl. ¶ 44(d).

one-year terms unless either party provided notice of its intent not to renew or otherwise terminated the agreement.[32] AstraZeneca had the right to terminate the Clinical Supply Agreement for convenience upon providing at least 30 months' written notice to Viela.[33] If AstraZeneca terminated the Clinical Supply Agreement for convenience, Viela had the right to require AstraZeneca to supply UPLIZNA until the earlier of Viela establishing an alternative manufacturing source or nine months from the date of termination.[34]

### 3. The MSDSA

Under the MSDSA, AstraZeneca provided Viela with clinical and non-clinical supplies and developmental services for the six acquired molecules.[35] The MSDSA permitted Viela, "in its sole discretion, to engage other service providers in relation to any Products."[36] The MSDSA was set to expire, by its terms, on February 23, 2028.[37] If there were no product schedules in force for a continuous period of 12

---

[32] Clinical Supply Agreement § 19.1. If either party gave notice not to renew, AstraZeneca and Viela were required to cooperate in good faith to negotiate a written technology transfer plan, and Viela was required to use reasonable efforts to carry out a reasonable technology transfer. *Id.* § 20.2.

[33] *Id.* § 19.2(d). AstraZeneca was not permitted to terminate for convenience prior to February 23, 2019, the first anniversary of the effective date. *Id.*

[34] *Id.* § 20.3.

[35] AZ Defs.' Ex. 3 §§ (D), 1.1 [hereinafter "MSDSA"]; Compl. ¶ 44(c).

[36] MSDSA § 1.3. As defined in the MSDSA, "Products" refers to the molecules or other products being developed by Viela. *See id.* at Part C at 46.

[37] *Id.* § 1.4; Compl. ¶ 44(c).

months, both parties had the right to immediately terminate the MSDSA upon written notice.[38]  Viela also had a separate right to terminate the MSDSA for convenience upon at least six months' notice to AstraZeneca.[39]  AstraZeneca did not have a reciprocal right to terminate for convenience.

### 4.  The TSA

Pursuant to the TSA, MedImmune agreed to provide regulatory and operational services to Viela in connection with the acquired molecules.[40]  Unlike the other Support Agreements, the TSA did not have a fixed term.  The TSA expired on the earlier of either party terminating the agreement or at the conclusion of the final service period agreed by the parties.[41]  Viela, but not MedImmune, had a right to terminate for convenience upon at least 30 days' written notice.[42]

---

[38] MSDSA § 15.1. As defined in the MSDSA, Product Schedule means "(i) a Development Service Schedule or a Supply Schedule, or (ii) in the context of an Agreement formed by a particular Product Schedule, the Product Schedule entered into to form the Agreement." *Id.* at Part C at 46.  Development Service Schedule "means a schedule completed and entered into between the Parties for development activities to be undertaken with respect to a Product." *Id.* at Part C at 43.  Supply Schedule "means a schedule completed and entered into between the Parties for the supply of a Product or related services." *Id.* at Part C at 47.

[39] *Id.* § 15.4.  Viela's termination for convenience would not terminate any Product Schedule then in force.  *Id.*

[40] AZ Defs.' Ex. 2 § 2.1 & Schedule 1 [hereinafter "TSA"]; Compl. ¶ 44(f).

[41] TSA § 7.1.

[42] *Id.* § 7.2.1.

### 5. The Commercial Supply Agreement

Under the Commercial Supply Agreement, AstraZeneca Pharmaceuticals LP ("AZP"), one of AstraZeneca's affiliates, contracted to manufacture and supply UPLIZNA for Viela's commercial use.[43] The Commercial Supply Agreement, by its terms, would expire on April 4, 2029, unless earlier terminated.[44] Both parties had the right to terminate for convenience upon at least 36 months' written notice.[45] Similar to the Clinical Supply Agreement, in the event that AZP terminated the Commercial Supply Agreement for convenience, Viela had the right to require AZP to continue to supply UPLIZNA until the earlier of Viela securing a replacement manufacturer or 12 months following the termination date.[46]

In addition to the Support Agreements, Viela and AstraZeneca entered into various lease agreements, including for office space at AstraZeneca's U.S. headquarters, conference and training spaces, and certain laboratory equipment,

---

[43] AZ Defs.' Ex. 6 §§ 2.1, 2.3, 2.5 [hereinafter "Commercial Supply Agreement"]; Compl. ¶ 44(e). Unlike the other Support Agreements, which the parties entered into concurrently with the APA on February 23, 2018, the Commercial Supply Agreement is dated as of April 4, 2019.

[44] Commercial Supply Agreement § 19.1.

[45] *Id.* § 19.2(d). AstraZeneca was not permitted to terminate for convenience prior to April 4, 2020, the first anniversary of the effective date. *Id.*

[46] *Id.* § 20.2.

supplies, and other consumables.[47] In its annual report for 2020, Viela disclosed the

following risk factors regarding its ongoing business relationship with AstraZeneca:

> We are, and for a period of time will be, substantially reliant on AstraZeneca to provide [the] services [under the Support Agreements], and if AstraZeneca is unable or unwilling to satisfy its obligations under these agreements, we could incur operational difficulties or losses that could have a material and adverse effect on our business, prospects, financial condition and results of operations. . . . We do not have the ability to independently conduct clinical trials. . . . [and] we rely on AstraZeneca for certain operational and regulatory services with respect to each of our product candidates and their clinical trials and pre-clinical trials.[48]

> We do not currently own or operate, nor do we have any plans to establish in the future, any manufacturing facilities or personnel. . . . [W]e rely on AstraZeneca for the manufacture of the current clinical and commercial supplies of UPLIZNA. . . . If AstraZeneca or other contract manufacturers we may engage in the future cannot successfully manufacture material that conforms to our specifications and the regulatory requirements of the FDA or a comparable foreign regulatory authority, we will not be able to use the product candidates or products produced at their manufacturing facilities.[49]

## C. The IPO

In April 2019, the FDA awarded UPLIZNA Breakthrough Therapy status.[50]

Six months later, Viela completed its initial public offering ("IPO"), raising another

---

[47] Compl. ¶¶ 44, 51.

[48] AZ Defs.' Ex. 54 at 71 [hereinafter "Viela FY20 Annual Report"].

[49] *Id.* at 72–73.

[50] Compl. ¶ 70.

$150 million in equity financing.[51] In connection with the IPO, Viela's stock was listed on the Nasdaq Global Select Market.[52] All of the then-outstanding shares of Viela's preferred stock were converted into shares of common stock.[53] AstraZeneca, Boyu Capital Advisory Company Limited ("Boyu"), 6 Dimensions Capital ("6 Dimensions"), and HBM Healthcare Investments AG ("HBM") were Viela's largest stockholders following the IPO.[54] Boyu, 6 Dimensions, and HBM each had a representative on the Board at all relevant times.[55]

---

[51] *Id.* ¶ 41.

[52] *See* AZ Defs.' Ex. 11.

[53] Viela Bio, Inc., Prospectus (Oct. 2, 2019), at 180 ("As of September 10, 2019, there were 40,618,706 shares of Series A Preferred Stock and Series B Preferred Stock outstanding, held of record by 13 stockholders. Upon the completion of this offering, all outstanding shares of Series A Preferred Stock and Series B Preferred Stock will be converted into an aggregate of 40,618,706 shares of our common stock."). The court takes judicial notice of the Prospectus from Viela's IPO. *Santa Fe*, 669 A.2d at 69.

[54] Compl. ¶ 57. Boyu held approximately 15.72% of Viela's outstanding common stock, 6 Dimensions held approximately 7.21% of Viela's outstanding common stock, and HBM held approximately 3.19% of Viela's outstanding common stock immediately prior to the Merger. *Id.* ¶¶ 33–35.

[55] *See id.* ¶¶ 33–35, 57. Like AstraZeneca, Boyu, 6 Dimensions, and HBM had the right to elect directors to the Board as holders of Viela preferred stock prior to the IPO. *See* AZ Defs.' Ex. 7 at 172–73; AZ Defs.' Ex. 12 at F-17. Prior to Viela's IPO, the holders of Viela's preferred stock had the right to elect seven of the Board's then eight directors. AZ Defs.' Ex. 12 at F-17. AstraZeneca, as the holder of Series A-1 Preferred Stock, had the right to elect two directors. *Id.* Boyu, 6 Dimensions, and the other holders of Series A-2 Preferred Stock were entitled to elect four directors. *Id.* HBM and the other holders of Series B Preferred Stock were entitled to elect one director. *Id.* Hu and Cao served as 6 Dimension and Boyu's representatives on the Board, respectively, from February 2018 through the Merger. Compl. ¶¶ 33–34. Wicki served as HBM's representative on the Board beginning in June 2019. *Id.* ¶ 35. She was reelected in June 2020 as a Class I director and remained on the Board through the Merger. *See id.*

In connection with the IPO, the Company adopted a Third Amended and Restated Certificate of Incorporation (the "Viela Certificate") and Restated Bylaws, which implemented a classified board structure.[56] Under the Viela Certificate, directors may be removed only for cause and only by an affirmative vote of the holders of at least 75% of the voting power of the Company's then-outstanding capital stock.[57] A similar threshold vote was required to amend certain provisions of the Viela Certificate.[58] Any stockholder proposal to adopt, amend, or repeal any of the Company's bylaws requires the affirmative vote of the holders of at least 75% of the voting power of the Company's then-outstanding capital stock, unless the Board recommends approval of the proposal, in which case the affirmative vote of the holders of a majority of the voting power is required.[59] The Board was

---

[56] AZ Defs.' Ex. 9 Art. Sixth (B) [hereinafter "Viela Certificate"].

[57] Viela Certificate Art. Sixth (E). Viela's operative bylaws contain identical stockholder voting provisions. *See* AZ Defs.' Ex. 10 Art. II § 3 [hereinafter "Viela Bylaws"].

[58] Viela Certificate Art. Tenth. A stockholder vote was required to "amend, alter or repeal, or adopt any provision inconsistent with, Articles FIFTH, SIXTH, SEVENTH, EIGHTH, NINTH, . . . Article TENTH and Articles ELEVENTH and TWELFTH" of the Viela Certificate. *Id.*

[59] *Id.* Art. Seventh; *see also* Viela Bylaws Art. X (requiring an affirmative vote of the holders of at least 75% of the voting power of the Company's then-outstanding capital stock for a stockholder proposal to adopt, amend, or repeal the bylaws and an affirmative vote of the holders of a majority of the voting power of the Company's then-outstanding capital stock if the Board recommends a stockholder proposal to adopt, amend, or repeal the bylaws).

authorized to unilaterally adopt, amend, or repeal any of the Company's bylaws without any stockholder action.[60]

In addition, the Viela Certificate designates this court as the "sole and exclusive forum" for "any action or proceeding asserting a claim of breach of a fiduciary duty owed by any current or former director, officer or other employee of the Corporation, to the Corporation or the Corporation's stockholders" (the "Forum Provision").[61] The Forum Provision was included in the version of the Viela Certificate adopted on February 22, 2018, at the time of the spin-off.[62] The Viela Certificate also contains an exculpatory provision under 8 *Del. C.* § 102(b)(7) that protects the Company's directors from liability for any monetary damages for breaches of the duty of care.[63]

Since Viela's IPO, AstraZeneca and Viela have been working to consummate a separation of their businesses.[64] On May 26, 2020, Viela announced a follow-on

---

[60] Viela Certificate Art. Seventh.

[61] *Id.* Art. Twelfth.

[62] The court takes judicial notice of the adoption of the Forum Provision on February 22, 2018. *See In re Wheelabrator Techs. Inc. S'holders Litig.*, 1992 WL 212595, at *11–12 (Del. Ch. Sept. 1, 1992) (explaining that the court, on a motion to dismiss under Rule 12(b)(6), may take judicial notice of a Delaware corporation's certificate of incorporation filed with the Secretary of State); *In re Carvana Co. S'holders Litig.*, 2022 WL 3923826, at *2 n.14 (Del. Ch. Aug. 31, 2022) (applying *Wheelabrator* and explaining that the court may take judicial notice of a Delaware corporation's certificate of incorporation on a motion to dismiss under Rule 12(b)(2)).

[63] Viela Certificate Art. Ninth.

[64] Director Defs.' Ex. F at 1 [hereinafter "January 8 Letter"].

offering where the Company raised an additional $169 million in financing.[65] Meanwhile, Viela was in Phase 3 clinical trials to develop UPLIZNA for three other autoimmune disorders and was developing three other investigational therapies—VIB4920, VIB7734, and VIB1116.[66]

In early June 2020, before UPLIZNA was sold commercially, Viela's management prepared a set of financial projections (the "June Projections"). The June Projections forecasted (i) total cumulative revenues of $1.064 billion; (ii) total cumulative operating expenses of $914 million; and (iii) total cumulative operating income of $130 million for the period from 2021 to 2024.[67] Viela's management forecasted $18 million in total revenue from UPLIZNA sales in 2020, with revenues projected to increase to $294 million in 2024.[68] Management estimated that 85 prescriptions of UPLIZNA would be sold in 2020, and the number of prescriptions would increase to 1,345 in 2024.[69] Mitchell Chan, Viela's then chief financial

---

[65] Compl. ¶ 75.

[66] *Id.* ¶¶ 72–73.

[67] Director Defs.' Ex. K at VIE220_0002986; Compl. ¶¶ 100, 110. The June Projections are dated as of June 12, 2020. Director Defs.' Ex. K at VIE220_0002986.

[68] Director Defs.' Ex. K at VIE220_0002986.

[69] *Id.* at VIE220_0002957.

officer, discussed the June Projections with the Board at a meeting on June 19, 2020.[70]

### D. Opportunities on the Horizon

The FDA approved UPLIZNA to treat NMOSD on June 11, 2020, and Viela launched UPLIZNA commercially in the United States later that month.[71] In early July 2020, Viela began discussing a potential collaboration with Horizon.[72] On July 15, 2020, Viela and Horizon signed a nondisclosure agreement.[73] That same day, Viela entered into a nondisclosure agreement with Goldman Sachs & Co. LLC ("Goldman Sachs"), the Company's financial adviser since its IPO, to assist with "the evaluation of strategic alternatives."[74] Over the summer of 2020, Horizon conducted preliminary due diligence regarding UPLIZNA and the Company's other product candidates.[75] During this period and into early fall 2020, Horizon expressed interest only in a limited partnership regarding VIB7734.[76]

---

[70] *See id.* at VIE220_0002933. The June Projections were circulated to the Board as pre-read materials for the June 19 meeting. *Id.* at VIE220_0002986.

[71] Compl. ¶ 71.

[72] Director Defs.' Ex. A at 14 [hereinafter "Viela Schedule 14D-9"].

[73] Compl. ¶ 81; AZ Defs.' Ex. 17; *see also* Viela Schedule 14D-9 at 14.

[74] AZ Defs.' Ex. 18 at 1; *see* Compl. ¶ 81.

[75] Viela Schedule 14D-9 at 14.

[76] *See* Compl. ¶ 81; Viela Schedule 14D-9 at 15.

Meanwhile, Soriot, on behalf of AstraZeneca, began to pursue an acquisition of Alexion Pharmaceuticals, Inc. ("Alexion"), which also had an FDA-approved drug for NMOSD.[77] On August 10, 2020, Soriot met with Alexion's board chairman to express interest in an acquisition.[78] On September 2, 2020, after Soriot had additional meetings with Alexion's leadership, AstraZeneca offered to acquire Alexion for $148.00 per share, which Alexion rejected.[79] AstraZeneca increased its offer to $155.00 per share on September 8, which Alexion also rejected.[80]

On September 9, 2020, Soriot notified Viela that he was resigning from the Board, effective at the end of the day on September 18, 2020.[81] "There is no record that Soriot disclosed his pursuit of Alexion to the full Viela Board."[82]

On September 18, 2020, the Board met with Goldman Sachs to discuss the financial outlook in the biotechnology landscape and the potential for a partnership or a business combination.[83] At that meeting, attended by all eight directors, the Board resolved to engage Goldman Sachs to identify and explore partnerships or

---

[77] Compl. ¶¶ 61–62.

[78] *Id.* ¶ 62.

[79] *Id.*; AZ Defs.' Ex. 58 at 54.

[80] Compl. ¶¶ 11, 62; AZ Defs.' Ex. 58 at 54.

[81] Compl. ¶ 62; AZ Defs.' Ex. 19.

[82] Compl. ¶ 62.

[83] Viela Schedule 14D-9 at 14–15; *see also* Director Defs.' Ex. B at VIE220_0000029–33.

other strategic alternatives.[84] Goldman Sachs's presentation to the Board noted that "partnership+" opportunities would allow Viela to "gauge near-term M&A interest."[85]

Goldman Sachs's engagement letter states that it was retained "(i) as exclusive financial advisor in connection with one or more potential partnership or licensing transactions with a third party to sell, market and distribute all or a portion of the Company's products . . . and (ii) . . . in connection with the possible sale of all or a portion of the Company."[86] From October to mid-November 2020, Viela and Goldman Sachs conducted "Project Zenith."[87] As part of Project Zenith, Goldman Sachs contacted eight pharmaceutical companies to gauge interest about partnering with Viela.[88] Of the eight partnership candidates, five expressed interest in discussing a partnership and signed confidentiality agreements.[89]

In parallel with Project Zenith, the Company continued its discussions with Horizon.[90] On October 6, 2020, Yao met with Horizon senior management to

---

[84] Director Defs.' Ex. C at VIE220_0000001.

[85] Director Defs.' Ex. B at VIE220_0000029.

[86] Director Defs.' Ex. D at 1.

[87] Compl. ¶ 85.

[88] *Id.*; *see also* Viela Schedule 14D-9 at 15.

[89] Viela Schedule 14D-9 at 15.

[90] *Id.*

19

discuss VIB7734.[91]  At that meeting, Yao sought an acquisition offer from Horizon.[92]  Horizon's CEO, Timothy Walbert, recalled:  "[W]e were instructed that there was not an interest in a one-off licensing deal [and] that we should be considering a broader type of collaboration with the Viela team."[93]  On October 29, 2020, Horizon offered to acquire Viela for $44.00 per share in cash consideration, a 35% premium over the $35.54 prior day closing price.[94]  Horizon proposed a two-step cash tender offer with an expedited diligence and closing timeline.[95]  The proposal also stated that any stockholders with Board representatives, including AstraZeneca, would be required to sign tender and support agreements in connection with the transaction.[96]

The next day, on October 30, 2020, Viela's management presented updated financial projections to the Board (the "October Projections").[97]  The October

---

[91] Compl. ¶ 79.

[92] *Id.*; *see also* Viela Schedule 14D-9 at 15 (explaining that during the October 6 meeting, Yao indicated that Viela "would be more interested in pursuing a broader collaboration beyond VIB7734" and following the meeting, Horizon confirmed its "interest in pursuing a broader collaboration transaction" and requested "a follow-up discussion with members of the Company's team to address additional questions").

[93] Compl. ¶ 79 (emphasis omitted) (internal quotation marks omitted).

[94] *Id.* ¶¶ 80, 103; AZ Defs.' Ex 22 at VIE220_0000570.

[95] Compl. ¶ 80; *see also* AZ Defs.' Ex. 22 at VIE220_0000570–71.

[96] Compl. ¶ 80; *see also* AZ Defs.' Ex. 22 at VIE220_0000571.

[97] Director Defs.' Ex. L at VIE220_0003088.  The October Projections were circulated to the Board as pre-read materials for the October 30 meeting.  *Id.*  The October Projections are dated as of October 23, 2020.  *Id.*

20

Projections forecasted (i) total cumulative revenues of $828 million; (ii) total cumulative operating expenses of $1,130 million; (iii) and total cumulative operating losses of $355 million for the period from 2021 to 2024.[98] The October Projections also reduced the forecasted net revenue for UPLIZNA from $18 million to $11 million for 2020, and from $294 million to $250 million for 2024.[99]

On November 3, 2020, the Board met telephonically with representatives from Goldman Sachs to discuss Horizon's October 29 proposal. After reviewing Goldman Sachs's valuation analyses and the October Projections, the Board determined that the $44.00 per share proposal was inadequate,[100] and the Board authorized Yao to deliver that message to Horizon.[101] In accordance with his instructions from the Board, Yao told Walbert that the October 29 proposal "substantially undervalued the Company," but noted that the Board "would give appropriate consideration to a significantly improved proposal consistent with its fiduciary duties."[102]

---

[98] *Id.*; Compl. ¶¶ 104, 110.

[99] *Compare* Director Defs.' Ex. K at VIE220_0002986, *with* Director Defs.' Ex. L at VIE220_0003088.

[100] AZ Defs.' Ex. 23 at VIE220_0000133; Viela Schedule 14D-9 at 15.

[101] Viela Schedule 14D-9 at 16.

[102] *Id.* at 17.

Horizon, on November 12, 2020, made a revised non-binding offer of $49.50 per share, representing about a 12% increase from the October 29 proposal and a $14.23 premium over the closing price of Viela stock the previous day.[103]  Walbert and Yao also discussed the anticipated retention of Viela executive management, including Yao, in the transaction.[104]  Horizon's offer letter, in referencing these conversations, stated:  "[W]e hold the Viela team in high regard . . . .  Our view remains that your team is a critical component of the potential combination of our companies and our intention is to retain as much of [the] team as possible."[105]

On November 13, 2020, the Board met with Goldman Sachs and the Company's outside counsel at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz Levin") to discuss Horizon's revised proposal.[106]  As of that date, only four companies remained active in the Project Zenith process.[107]  The Board concluded that Horizon's revised proposal was inadequate, but determined to convey the Company's receptiveness to a rebid with guidance towards a $55.00 per share price.[108]  At this meeting, Yao informed the Board, after Rivers excused himself,

---

[103] *Id.*; *see also* AZ Defs.' Ex. 25 at VIE220_0000574.

[104] Compl. ¶ 82; *see also* AZ Defs.' Ex. 25 at VIE220_0000574.

[105] AZ Defs.' Ex. 25 at VIE220_0000574.

[106] *See* Compl. ¶ 83; Viela Schedule 14D-9 at 17.

[107] Viela Schedule 14D-9 at 17.

[108] *Id.*

that he had been periodically meeting with Soriot to discuss Viela and disclosed his intention to "confidentially explore AstraZeneca's current view as a shareholder of various transaction scenarios in view of the Company's current progress."[109] There is no record that Soriot, in these discussions with Yao, disclosed that AstraZeneca was pursuing an acquisition of Alexion, Viela's competitor.[110]

On November 16, 2020, Horizon offered to acquire Viela for $53.00 per share, which represented an increase of about 7% from the November 12 proposal and about 20% from the October 29 proposal.[111] On November 16, Viela's stock closed at a price of $34.99 per share.[112] The next day, the Board met with Goldman Sachs and Mintz Levin to review the updated proposal. The Board concluded that the revised offer price was "in the best interests of the Company shareholders" and agreed to provide Horizon with additional diligence materials and to enter into negotiations for a definitive merger agreement.[113] In addition to discussing the Horizon proposal, the Board instructed Goldman Sachs to ask the two remaining parties in the Project Zenith process "if either would be interested in submitting a

---

[109] AZ Defs.' Ex. 26 at VIE220_0000166.

[110] *See* Compl. ¶ 83.

[111] Viela Schedule 14D-9 at 16; AZ Defs.' Ex. 28 at VIE220_0000576.

[112] Viela Schedule 14D-9 at 16.

[113] AZ Defs.' Ex. 29 at VIE220_0000231; Viela Schedule 14D-9 at 18.

23

proposal to acquire the Company."[114]  Neither of them expressed interest in acquiring Viela.[115]

In mid-December, while Horizon was conducting diligence and the parties were negotiating terms of the merger agreement, Horizon encountered a manufacturing issue with one of its key FDA-approved products, TEPEZZA, brought on by a government-mandated COVID-19 vaccine production order.[116]  On December 17, 2020, Horizon publicly disclosed its supply chain disruptions and informed Viela that it was ceasing merger negotiations until it resolved its supply chain issues.[117]  In light of this development, the Board met with its advisers to discuss the Company's options.  The Board decided not to terminate discussions with Horizon and to continue to proactively engage with the remaining potential partners involved in Project Zenith.[118]  At this point, only one remained active in the process.[119]  Given the status of Horizon's supply chain issues, Horizon and Viela

---

[114] Viela Schedule 14D-9 at 18; *see also* AZ Defs.' Ex. 29 at VIE220_0000231.

[115] Viela Schedule 14D-9 at 18; *see* Compl. ¶ 85.

[116] *See* Compl. ¶¶ 13, 86; AZ Defs.' Ex. 38 at 1.

[117] Compl. ¶ 86; Viela Schedule 14D-9 at 19.  On December 15, Horizon had informed Viela that it needed additional time to finalize the Merger.  AZ Defs.' Ex. 37 at VIE220_0003213.

[118] Viela Schedule 14D-9 at 19; AZ Defs.' Ex. 40 at VIE220_0003131.

[119] Viela Schedule 14D-9 at 19.

agreed that they would resume acquisition discussions sometime in mid-January 2021.[120]

Meanwhile, on December 12, 2020, AstraZeneca announced that it was acquiring Alexion in a transaction valued at approximately $39 billion (the "Alexion Acquisition").[121] The Alexion Acquisition agreement contained a "hell or high-water clause," requiring AstraZeneca to take all actions necessary, proper or advisable to eliminate any anti-trust impediment to closing.[122]

### E. January 8, 2021 Letter and Completion of the Merger

Although the Viela-Horizon deal was on hold, antitrust review of the AstraZeneca-Alexion deal was underway. On January 8, 2021, following discussions between Yao and Soriot, AstraZeneca delivered a proposal to Viela to finalize the business separation of the two companies (the "January 8 Letter").[123] The January 8 Letter stated:

> Thank you for your engagement in your conversation with [Soriot] this week. As discussed with him, this letter sets out the remaining steps that we envisage will need to be taken to finalise [sic] the separation of Viela Bio, Inc . . . from AstraZeneca. As you know, this is a journey that is already well advanced and, since the IPO of Viela, we have been working steadily to complete the separation of the businesses. Given current developments it is important that we plan and work closely together over the coming weeks to achieve the full separation of Viela

---

[120] *Id.*

[121] Compl. ¶ 63; AZ Defs.' Ex. 35 at 2.

[122] AZ Defs.' Ex. 36 § 8.02(e).

[123] Compl. ¶ 88.

from AstraZeneca as expeditiously as possible while ensuring your business continuity. This will put you and any potential acquiror into the best position either to move forward as a fully independent company or to integrate your business in the event of an acquisition of Viela.[124]

The January 8 Letter noted that "many of the contractual and operational links between Viela and AstraZeneca that existed at the spin-out have either ceased or have become obsolete (or will have done so by the end of Q2 2021) as Viela has steadily moved towards full separation and independence from AstraZeneca."[125] It also proposed several alterations to the Support Agreements. For example, AstraZeneca proposed to:

- Complete all remaining service schedules under the Clinical Supply Agreement, Commercial Supply Agreement, and MSDSA until the end of Q2 2021, after which AstraZeneca would assist Viela in transitioning all other remaining services;

- Mutually terminate the existing sublicense agreements for intellectual property owned by third parties once Viela had entered into direct license agreements with the ultimate licensors;

- Work to re-locate Viela to new premises;

---

[124] January 8 Letter at VIE220_0003472.

[125] *Id.*

- Sell Viela the laboratory equipment exclusively used by Viela at its book value of less than $10,000, as opposed to the replacement cost estimated at $250,000; and

- Terminate the Clinical Supply Agreement and Commercial Supply Agreement after Viela and AstraZeneca align on a plan to terminate without interrupting Viela's supply of UPLIZNA.[126]

The January 8 Letter specifically noted that certain contracts would continue unchanged, including Viela's exclusive worldwide license to use certain shared patents and know-how to develop Viela products.[127]

The Board met telephonically on January 14, 2021. Management and Mintz Levin were present; Goldman Sachs was not. Among the items discussed, according to the minutes of the meeting, was "the status of the Company's communications with AstraZeneca regarding AstraZeneca's interest in accelerating the separation between AstraZeneca and the Company."[128] The minutes indicate that Rivers excused himself before the Board discussed matters involving AstraZeneca.[129] Prior to the meeting, Nolet sent the following email message to Yao:

---

[126] *Id.* at VIE220_0003473–75.

[127] *Id.* at VIE220_0003474–75.

[128] AZ Defs.' Ex. 43 at VIE220_0000254.

[129] *Id.*

I am really looking forward to our session on Thursday. I am hoping that we can set aside a few minutes for an important matter. Mitch[ell Chan] has been doing some important spade work around the notion of us essentially having to find a buyer for our shares held by AZ if other events don't occur first. I think this is a very important topic that we should begin to address, unless you have heard that the pending deal is likely to close soon.[130]

In a most fortuitous development for Viela, on January 18, 2021, Horizon notified the Company that it was prepared to resume acquisition talks the following week.[131] Yao informed the Board in an email on January 25, 2021, that the Horizon deal was "back on track," and the parties were aiming to sign a transaction agreement by February 1, 2021.[132] The Board met with Company management, Goldman Sachs, and Mintz Levin on January 29, 2021, to discuss the status of the merger agreement and overall market conditions.[133]

On January 31, 2021, the Board met with its legal and financial advisers to consider and approve the transaction with Horizon. Mintz Levin reported that there were no material changes to the merger agreement discussed at the January 29

---

[130] AZ Defs.' Ex. 42 at VIE220_0003206.

[131] Viela Schedule 14D-9 at 19. In an email to the other members of the Board, Yao reported: "We had a conversation with [Horizon] today. The plan is to re-engage in our deal process mid-next week, and to finalize the Shareholder Support Agreements this week. We will keep you updated as this progresses." AZ Defs.' Ex. 44 at VIE220_0003165.

[132] AZ Defs.' Ex. 45 at VIE220_0003186.

[133] Viela Schedule 14D-9 at 20; AZ Defs.' Ex. 46 at VIE220_0003137; *see also generally* AZ Defs.' Ex. 47.

meeting.[134] Goldman Sachs "provided an oral fairness opinion,"[135] which it later documented in a letter opining that the "$53.00 in cash per Share to be paid to the holders (other than [Horizon] and its affiliates) pursuant to the [Merger] Agreement is fair from a financial point of view to such holders" (the "Fairness Opinion").[136] In doing so, Goldman Sachs, at the Board's direction, relied upon the October Projections.[137]

The Board unanimously approved the merger at the previously negotiated share price of $53.00 per share, a 52.8% premium over the Company's prior-day closing share price (the "Merger").[138] At the time the Merger was approved, the Board consisted of Rivers, Yao, and the Non-AZ Directors. Horizon and Viela executed the merger agreement the same day (the "Merger Agreement"). The Merger Agreement provided that the Merger was to be consummated as a two-step transaction under Section 251(h) of the Delaware General Corporation Law (the "DGCL"),[139] consistent with Horizon's original proposal.[140] In the first step, Horizon would commence a tender offer to purchase all of the Company's common

---

[134] Viela Schedule 14D-9 at 20.

[135] AZ Defs.' Ex. 48 at VIE220_0000486.

[136] Viela Schedule 14D-9 at AI-3.

[137] Compl. ¶ 110.

[138] Viela Schedule 14D-9 at 20–21; *see also* AZ Defs.' Ex. 48 at VIE220_0000487.

[139] AZ Defs.' Ex. 50 §§ 1.1, 2.1 [hereinafter "Merger Agreement"].

[140] AZ Defs.' Ex. 22 at VIE220_0000570.

stock for $53.00 per share in cash.[141]  The Merger Agreement contained a minimum tender condition, requiring the tender of at least 51% of the total number of the outstanding Company shares.[142]  Upon satisfaction of the first step, Horizon would effect a cash-out merger for all shares that had not been tendered in the tender offer.[143]

The Merger Agreement contained a restrictive covenant that prohibited Viela from amending or modifying material provisions in any material contracts, which included the Support Agreements, without Horizon's prior written consent.[144]  The Merger Agreement also contained a no-shop provision restricting the Company from soliciting alternative acquisition proposals during the interim period between signing and closing.[145]  Prior to the completion of the tender offer, however, the Company was permitted to respond to unsolicited acquisition proposals and had the right to terminate the Merger Agreement if the Company received a superior offer from a third party.[146]

---

[141] Merger Agreement Recitals (A) & § 1.1.

[142] *Id.* Annex I.

[143] *Id.* Recitals (B) & § 2.1; *see also* Viela Schedule 14D-9 at 23.

[144] Merger Agreement § 5.3(w); *see also* Director Defs.' Ex. G at VIE220_0002528–29 [hereinafter "Disclosure Letter"] (listing the Support Agreements as material contracts on the Company's Disclosure Letter to the Merger Agreement).

[145] Merger Agreement § 5.4(b); *see also* Compl. ¶ 94.

[146] Merger Agreement §§ 5.4(c), 8.1(f).

In connection with the Merger, AstraZeneca, 6 Dimensions, Boyu, HBM, Rivers, Cao, Hu, Wicki, and Yao entered into tender and support agreements with Horizon and agreed to tender their Viela shares in the tender offer.[147]  In addition, Horizon offered Yao a 12-month consulting agreement, pursuant to which Yao would "support [Horizon]'s research and development programs" for a monthly consulting fee of $50,000.[148]  The consulting agreement was contingent on the closing of the Merger.[149]

On February 1, 2021, Horizon and Viela issued a joint press release announcing the Merger, indicating that the deal was valued at approximately $3 billion.[150]  The Company filed its Schedule 14D-9 with the SEC on February 12, 2021, recommending that the Company's stockholders accept the offer and tender their shares.[151]  The Schedule 14D-9 disclosed information about the events leading up to the Merger, the tender offer, the October Projections, and included a copy of Goldman Sachs's Fairness Opinion and a summary of its analyses.[152]

---

[147] Viela Schedule 14D-9 at 3.

[148] *Id.* at 12.

[149] *Id.*

[150] *Id.* at 20.

[151] *Id.* at 3.

[152] *Id.* at 23–36.

Horizon commenced its tender offer the same day that the Company filed its Schedule 14D-9.[153] At the close of the offer period on March 13, 2021, 94% of the Company's stockholders tendered their shares.[154] On March 15, 2021, Horizon and Viela then consummated the Merger without a stockholder vote pursuant to Section 251(h) of the DGCL.[155]

Following the closing of the Merger, Horizon and AstraZeneca negotiated amendments to the Support Agreements.[156] Alexion and AstraZeneca received antitrust clearance from regulators in the U.S. in April 2021 and in the European Union in July 2021 and proceeded to close their deal.[157]

### F.    Procedural Posture

Plaintiff filed his Complaint as a class action on February 2, 2023.[158] The Complaint contains five counts. Count I alleges that AstraZeneca, as Viela's controlling stockholder, breached its fiduciary duties to the class by launching Viela into a rushed and unfair merger in order to secure antitrust approval of the Alexion Acquisition.[159]

---

[153] *Id.* at 21.

[154] Director Defs.' Ex. J at 1.

[155] *Id.*

[156] AZ Defs.' Exs. 57, 63.

[157] *See generally* AZ Defs.' Exs. 59, 62.

[158] Dkt. 1.

[159] *Id.* ¶¶ 134–38.

Count II alleges that Soriot, prior to his resignation from the Board, breached his duty of loyalty by leading AstraZeneca to acquire Alexion, Viela's main competitor, while simultaneously pushing Viela into a single-bidder sale process.[160] Count III alleges that Rivers, who was also an AstraZeneca officer, breached his duty of loyalty by advancing the self-interests of AstraZeneca and by causing Viela to issue misleading disclosures and omitting material information from the Schedule 14D-9.[161] Count IV alleges that Yao, as a director and officer of the Company, breached his duties of loyalty and care by voting to approve the Merger and for causing the Company to issue materially misleading disclosures and omitting material information from the Schedule 14D-9.[162] Count V alleges that the Non-AZ Directors breached their fiduciary duty of loyalty by approving the Merger and for causing the Company to issue materially misleading disclosures and omitting material information from the Schedule 14D-9.[163]

All the defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[164] AstraZeneca has also moved to dismiss the Complaint under Court of

---

[160] *Id.* ¶¶ 139–45.

[161] *Id.* ¶¶ 146–52.

[162] *Id.* ¶¶ 155–58.

[163] *Id.* ¶¶ 159–62.

[164] Dkts. 38, 41.

Chancery Rule 12(b)(2) for lack of personal jurisdiction.[165] The court heard oral argument on the motions to dismiss on December 12, 2023,[166] and received unsolicited supplemental submissions in late January 2024.[167] What follows is the court's ruling on the motions to dismiss.

## II. ANALYSIS

### A. May the Court Exercise Personal Jurisdiction Over AstraZeneca?

When a party moves to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), the court is obliged to consider that motion before addressing the merits of a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6). *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 327 (Del. Ch. 2003) (citing *Branson v. Exide Elecs. Corp.*, 625 A.2d 267, 269 (Del. 1993)). Under Court of Chancery Rule 12(b)(2), "[a] plaintiff bears the burden of showing a basis for a trial court's exercise of jurisdiction over a nonresident defendant." *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005); *accord Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007); *In re Pilgrim's Pride Corp.*, 2019 WL 1224556, at *10 (Del. Ch. Mar. 15, 2019).

---

[165] Dkt. 38.

[166] Dkt. 72.

[167] Dkts. 76–77.

If the court does not hold an evidentiary hearing, which it has not, the plaintiff's burden "is a relatively light one." *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003). The plaintiff "must only make a *prima facie* showing that the exercise of personal jurisdiction is appropriate" and "the record is construed in the light most favorable to the plaintiff." *Id.* (internal quotation marks omitted). Stated differently, "[a] prima facie case requires the production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor. *Lone Pine Res., LP v. Dickey*, 2021 WL 2311954, at *4 (Del. Ch. June 7, 2021) (internal quotation marks omitted). In ruling on a Rule 12(b)(2) motion, the court "may consider the pleadings, affidavits, and any discovery of record." *Pilgrim's Pride*, 2019 WL 1224556, at *10 (internal quotation marks omitted).

Delaware courts typically apply a two-prong test in evaluating whether a plaintiff has met its burden to establish personal jurisdiction over a non-resident defendant. *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018). First, the court considers whether service of process on the non-resident defendant is authorized by statute. *Id.* The court then determines whether the exercise of personal jurisdiction comports with the requirements of due process. *Id.*

Parties may consent to personal jurisdiction in Delaware by contract, including through a forum selection provision. *Nat'l Indus. Gp. (Hldg.) v. Carlyle*

*Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013).  When a party consents to personal jurisdiction in Delaware, the court can forgo the typical two-step jurisdictional analysis.  *BAM Int'l, LLC v. MSBA Gp. Inc.*, 2021 WL 5905878, at *6 (Del. Ch. Dec. 14, 2021).  "Consent to personal jurisdiction is often express, but it can also be implied."  *Pilgrim's Pride*, 2019 WL 1224556, at *11.  Delaware courts have "applied the principles of implied consent to hold that when parties specify an exclusive forum for disputes, they implicitly agree to the existence of personal jurisdiction in that forum."  *Id.* at *12; *see also, e.g.*, *Carvana*, 2022 WL 3923826, at *3–6 (applying *Pilgrim's Pride* and holding that the company's controlling stockholder implicitly consented to personal jurisdiction in Delaware by causing the company to adopt a forum selection provision in its certificate of incorporation); *Kormos v. Playtika Hldg. UK II Ltd.*, C.A. No. 2023-0396-SG, at 11:24–14:9 (Del. Ch. Jan. 18, 2024) (TRANSCRIPT) (same).

AstraZeneca argues in its opening brief that AstraZeneca plc and AstraZeneca UK are not Delaware entities, and the mere ownership of stock in a Delaware corporation does not enable a Delaware court to exercise personal jurisdiction over a non-consenting party.[168]  Plaintiff's primary argument, relying on *Pilgrim's Pride*,

---

[168] AZ. Defs.' Opening Br. 55–56.  AstraZeneca also argues that AstraZeneca plc did not own any Viela stock and therefore cannot be subject to personal jurisdiction or a breach of fiduciary duty claim in Delaware.  *Id.* at 30 n.127, 55.  Plaintiff, in response, points to

36

is that AstraZeneca implicitly consented to jurisdiction in Delaware because it controlled Viela, "embedded an exclusive Delaware forum selection clause in Viela's certificate of incorporation," and "chose to maintain operational control over the Company, seat multiple directors on the Company's board, and maintain a high degree of individual corporate governance control of the Company."[169]

In *Pilgrim's Pride*, the court held that the company's controlling stockholder implicitly consented to the existence of personal jurisdiction in Delaware when its

---

allegations in the Complaint that AstraZeneca plc publicly reported that (i) it was a beneficial owner of Viela stock and (ii) it "may be deemed to have sole voting and dispositive power with respect to [Viela] shares." Pl.'s Answering Br. 71 (alteration in original). In addition to publicly reporting itself as a beneficial owner of Viela stock, the Complaint alleges that AstraZeneca plc appointed Soriot, its CEO, to Viela's Board, and signed and delivered the January 8 Letter to Viela. Compl. ¶ 27. These allegations support a reasonable inference that AstraZeneca UK and AstraZeneca plc operated as a single entity with respect to Viela. AstraZeneca cites *Skye Mineral v. DXS Capital (U.S.) Limited*, 2020 WL 881544 (Del. Ch. Feb. 24, 2020), in support of its argument, but that case is distinguishable. AZ Defs.' Opening Br. 30 n.127. There, the court dismissed claims against certain individual defendants based on a control group theory where there were no allegations that the individual defendants owned company stock, appointed directors to the board, or had contractual veto rights, and where the alleged control group lacked a legally cognizable association. *Skye Mineral*, 2020 WL 881544, at *27. Here, Plaintiff does not allege that AstraZeneca UK and AstraZeneca plc operated as a control group. Instead, Plaintiff alleges that AstraZeneca plc "did not meaningfully distinguish itself" from AstraZeneca UK when interacting with Viela. Compl. ¶ 27. Moreover, unlike in *Skye Mineral*, the Complaint alleges that AstraZeneca plc beneficially owned Viela stock and appointed Soriot, its CEO, to the Board. *Id.* AstraZeneca also cites *Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717 (Del. Ch. Dec. 19, 2018), but that case is distinguishable for similar reasons. AZ Defs.' Opening Br. 30 n.127. In *Klein*, the court concluded that the allegations in the complaint did not support a reasonable inference that the individual defendant was a member of a control group where there were no allegations that the individual defendant owned any company stock. 2018 WL 6719717, at *13.

[169] Pl.'s Answering Br. 63.

37

representatives on the board of directors adopted a forum-selection bylaw. 2019 WL 1224556, at *13–14. The board adopted the bylaw on the same day the challenged transaction was approved, and the court concluded that it was reasonable to infer that the board adopted the bylaw intending it to apply to any Delaware law claims challenging the acquisition. *Id.* at *13. AstraZeneca argues that *Pilgrim's Pride* is distinguishable because the defendant was an undisputed controlling stockholder (*i.e.*, owning more than 50% of the outstanding voting power) when the forum selection bylaw was adopted and had the right to appoint six out of nine directors to the company's board.[170] By contrast, in this case, AstraZeneca argues that (i) the Forum Provision was adopted three years prior to the Merger; (ii) AstraZeneca only had the right to designate two directors to the Board; and (iii) the parties dispute whether and when AstraZeneca owned a majority of Viela's voting power.[171]

---

[170] AZ Defs.' Reply Br. 33; Dkt. 73 at 26:16–27:18 [hereinafter "Hr'g Tr."]. Following oral argument, Plaintiff submitted *Kormos* as supplemental authority for the court's consideration. Dkt. 76. In *Kormos*, the court found that the plaintiff made a *prima facie* showing that the defendant implicitly consented to jurisdiction in Delaware by causing the company to adopt a Delaware forum selection provision. C.A. No. 2023-0396-SG, at 12:21–15:5. AstraZeneca argues that *Kormos* is distinguishable, too, because the defendant was an undisputed mathematical controller at the time the forum provision was adopted and "loyalists with strong ties" to the controller comprised the company's board when the forum provision was adopted. Dkt. 77 at 1–2.

[171] Hr'g Tr. at 27:14–22. *Compare id.* at 36:19–22 ([Pl.'s Counsel]: "But [Viela was] a controlled company all the way up -- I mean, a fully controlled, more than 50 percent, actually, 100 percent up until October 2019."), *with id.* at 70:8–9 ([AstraZeneca's Counsel]: "Viela was not controlled 100 percent or 50 percent by AstraZeneca through October 2019."); *see also* Dkt. 77 at 2 (arguing that the "Complaint does not allege that [AstraZeneca] owned a majority of Viela stock *post-spin*" (emphasis added)).

In construing the record in light most favorable to the Plaintiff, the court concludes that the Plaintiff has made a *prima facie* showing that AstraZeneca implicitly consented to personal jurisdiction in Delaware by causing the Company to adopt the Forum Provision. The Forum Provision, while not in the Company's original certificate of incorporation, was adopted on February 22, 2018.[172] Thus, the parties' dispute over whether AstraZeneca held majority voting control at the time of Viela's IPO in October 2019 is beside the point. The relevant time is February 2018, when the Forum Provision was adopted. The Complaint alleges, and AstraZeneca does not dispute, that "AstraZeneca created Viela as a spin-off in February 2018."[173] The reasonable inference based on these allegations is that AstraZeneca owned a majority of Viela's voting power at the time the Forum Provision was adopted, which occurred concurrently with the spin-off.[174] It is also reasonable to infer, given the timeline of events, that AstraZeneca had direct

---

[172] The Forum Provision first appeared in Viela's amended certificate of incorporation, filed with the Delaware Secretary of State on February 22, 2018. The court can take judicial notice of filings with the Delaware Secretary of State on a motion to dismiss. *See Wheelabrator*, 1992 WL 212595, at *11–12 (taking judicial notice of publicly filed certificate of incorporation); *Carvana*, 2022 WL 3923826, at *2 n.14.

[173] Compl. ¶ 4; *see also id.* ¶ 41 (alleging that "Viela was formed in February 2018 as a spin-off of MedImmune/AstraZeneca").

[174] It also appears from Viela's Registration Statement, filed with the SEC on September 23, 2019, that AstraZeneca owned more than 50% of Viela's voting power in February 2018. *See* AZ Defs.' Ex. 7 at 172.

involvement in causing the Company to adopt the Forum Provision. [175] *See Carvana*, 2022 WL 3923826, at \*4 (explaining that the controller's "approval of the [company's] amended certificate of incorporation, including the Forum Provision, was a necessary and direct cause of its adoption"); *Kormos*, C.A. No. 2023-0396-SG, at 12:24–13:3 (explaining that the controlling stockholder "caused [the company] to create an amended and restated certificate of incorporation that contained a Delaware-exclusive forum provision for fiduciary actions").

Although it is true, as AstraZeneca argues, that the Forum Provision was adopted three years prior to the Merger, this distinction is inconsequential. AstraZeneca "did not need to foresee the specific transaction that would give rise to the claims against [it] for the Forum Provision to evidence [its] implicit consent." *Carvana*, 2022 WL 3923826, at \*5. It is well settled that Delaware has an interest in the application of its law to the internal affairs of Delaware corporations. *See VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005); *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 914 (Del. Ch. 2020) ("The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders."). A forum selection provision in a Delaware corporation's certificate of incorporation or bylaws is

---

[175] The APA, pursuant to which AstraZeneca spun-off the six MedImmune molecules to Viela, is dated February 23, 2018, the day after the Forum Provision was adopted. *See* AZ Defs.' Opening Br. viii, 7.

"intended to corral internal affairs cases so they can be heard in Delaware courts." *Carvana*, 2022 WL 3923826, at *5. At the time of the spin-off in February 2018, AstraZeneca caused the Company, a Delaware corporation, to adopt the Forum Provision in its amended certificate of incorporation. It is, therefore, reasonable to infer that AstraZeneca "knew of the purpose of forum selection provisions when [it] caused [Viela] to adopt one." *Id.*[176]

Thus, AstraZeneca implicitly consented to having this court adjudicate claims against it as a controlling stockholder, including the threshold question of whether it was, in fact, a controller at the time of the challenged transaction. For these reasons, Plaintiff has satisfied his minimal burden of showing a basis for the court's exercise of jurisdiction over AstraZeneca.[177]

---

[176] The Forum Provision, unlike the provisions at issue in *Pilgrim's Pride*, *Carvana*, and *Kormos*, does not expressly state that it applies to fiduciary duty claims brought against Viela's stockholders. *Compare* Viela Certificate Art. Twelfth, *with Pilgrim's Pride*, 2019 WL 1224556, at *12; *Carvana*, 2022 WL 3923826, at *4; *Kormos*, C.A. No. 2023-0396-SG, at 13:1–3. AstraZeneca, however, neither identified this distinction nor argued that it rendered the decisions in *Pilgrim's Pride*, *Carvana*, or *Kormos* inapposite.

[177] In addition to his implicit consent theory, Plaintiff makes a half-hearted argument that AstraZeneca has sufficient minimum contacts with Delaware to satisfy due process because AstraZeneca created Viela as a Delaware subsidiary. Pl.'s Answering Br. 64. Formation of a Delaware entity can serve as a sufficient nexus for exercising jurisdiction when the formation is "an integral component of the [total] transaction . . . to which the plaintiff's instant cause of action relates." *Lone Pine*, 2021 WL 2311954, at *5 (alterations in original) (internal quotation marks omitted); *Papendick v. Bosch*, 410 A.2d 148, 152 (Del. 1979) (holding due process was satisfied where the defendant "came into the State of Delaware to create, under the Delaware Corporation Law, a subsidiary corporation for the

41

## B. Does the Complaint State a Claim Against AstraZeneca for Breach of Fiduciary Duty?

### 1. Standard of Review

On a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6),

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and quotation marks omitted); *see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). The plaintiff is "entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *White v. Panic*, 783 A.2d 543, 549 (Del. 2001) (internal quotation marks omitted). "[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001). The court need

---

purpose of implementing its contract with [the seller] and accomplishing its acquisition of [the seller's] stock"). The fatal flaw in Plaintiff's due process theory is his failure to supply facts supporting an inference that ties the purpose of Viela's formation as a Delaware entity in December 2017 to the Merger.

not "accept every strained interpretation of the allegations proposed by the plaintiff." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Malpiede*, 780 A.2d at 1083).

## 2. Did AstraZeneca control Viela?

Delaware courts "will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but *exercises control* over the business affairs of the corporation." *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (emphasis in original) (quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)); *see also Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019). AstraZeneca owned 26.72% of Viela's voting power at the time of the Merger.[178]

When the assertion of control is not based upon ownership of more than 50% of the voting power of the corporation, as is the case here, a plaintiff must plead facts to support a reasonable inference that the alleged controller possessed "(i) control over the corporation's business and affairs in general or (ii) control over the corporation specifically for purposes of the challenged transaction." *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020). In other words, "the plaintiff may plead either (or both) of the following: (1) that the minority

---

[178] Compl. ¶¶ 4, 56.

43

blockholder actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged transaction or (2) that the minority blockholder actually dominated and controlled the majority of the board generally." *Tesla Motors*, 2018 WL 1560293, at *13. *"*[T]he *potential ability* to exercise control is not sufficient." *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018) (alteration in original) (internal quotation marks omitted), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE). "A plaintiff must allege domination by a minority shareholder through actual control of corporation conduct." *Lynch*, 638 A.2d at 1114 (internal quotation marks omitted).

The actual control test "is not easy to satisfy." *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 992 (Del. Ch. 2014) (internal quotation marks omitted), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015); *accord Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *16 (Del. Ch. May 31, 2017) ("The requirements for a sufficient pleading of controller status are appropriately rigorous . . . ."). The defendant's "power must be so potent that independent directors cannot freely exercise their judgment, fearing retribution from the controlling minority blockholder." *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (alteration and internal quotation marks omitted).

"To plead that the requisite degree of control exists generally, a plaintiff may allege facts supporting a reasonable inference that a defendant or group of defendants exercised sufficient influence 'that they, as a practical matter, are not differently situated than if they had majority voting control.'" *Voigt*, 2020 WL 614999, at *11 (quoting *In re PNB Hldg. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)). To make such a showing, the plaintiff may "plead that the defendant, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes." *Id.* (internal quotation marks omitted); *see also Tornetta v. Musk*, 310 A.3d 430, 500 (Del. Ch. 2024) (noting that "[t]he analysis of effective control looks to a stockholders' ability to exert influence as a stockholder, in the boardroom, and outside of the boardroom through managerial roles").

"Examples of actual control, include, but are not limited to: (i) relationships with particular directors, (ii) relationships with key managers or advisors, (iii) the exercise of contractual rights to channel the corporation into a particular outcome, and (iv) the existence of commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier." *Voigt*, 2020 WL 614999, at *12. Broader indicia of effective control may also factor into the court's control analysis, including the "ownership of a significant equity stake (albeit less than a majority), the right to designate directors (albeit less than a

45

majority), decisional rules in governing documents that enhance the power of a minority stockholder or board-level position, and the ability to exercise outsized influence in the board room or on committees, such as through high-status roles like CEO, Chairman, or founder." *Id.*

To establish transaction-specific control, an allegation of "pervasive control over the corporation's actions is not required." *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006). Rather, a plaintiff "must plead facts supporting a reasonable inference that the defendant in fact exercised actual control with regard to the particular transaction that is being challenged." *Voigt*, 2020 WL 614999, at *12 (internal quotation marks omitted). Supporting facts could include, for example, that "the defendant engaged in pressure tactics that went beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior." *Id.* at *13.

At the pleadings stage, a reasonable inference of actual control rests on the totality of the facts and circumstances considered in the aggregate. *See In re Vaxart S'holder Litig.,* 2021 WL 5858696, at *15 (Del. Ch. Nov. 30, 2021) ("Because the controller analysis is fact-intensive, the court is unlikely to find control unless plaintiffs can plead a 'constellation of facts' supporting control." (internal quotation marks omitted)). "The inquiry is 'highly fact specific,' and there is 'no magic

formula to find control.'" *Tornetta*, 310 A.3d at 508 (quoting *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016)).

Plaintiff maintains that AstraZeneca exerted both control over Viela generally and specifically with respect to the Merger. The facts underlying these two control theories overlap in many respects. *See Basho*, 2018 WL 3326693, at *27 ("Broader indicia of effective control also play a role in evaluating whether a defendant exercised actual control over a decision.").

### a.    Did AstraZeneca exercise general control over Viela's Board?

In support of his position that AstraZeneca exercised actual control over Viela generally, Plaintiff points to a combination of the following factors: (1) AstraZeneca's equity stake in the Company; (2) AstraZeneca's appointment of certain directors on Viela's Board; (3) AstraZeneca's appointment of and relationships with certain members of Viela's management team; (4) Viela's super-majority voting requirements for certain actions; and (5) the Support Agreements.[179]

### i.    Equity stake and supermajority voting requirements

Possession of a large voting block can contribute to an inference of control. *See Tornetta*, 310 A.3d at 502–03. As the court observed in *Tornetta*, equity positions of 25% or less have contributed to both pleading-stage inferences and post-

---

[179] Pl.'s Answering Br. 66–67.

trial findings that a minority stockholder owed fiduciary duties as a controller. *Id.* at 498 n.556 (collecting cases).[180] Plaintiff cites AstraZeneca's 26.72% equity stake in Viela as a factor in support of his theory that AstraZeneca exercised actual control over the Company. But he does so only in passing. Indeed, Plaintiff relegates this argument to one sentence in his answering brief.[181] Rather, Plaintiff focuses on AstraZeneca's 26.72% equity position as giving it unilateral veto power over certain corporate actions under the Viela Certificate and Viela's bylaws.[182]

"[A] blocking right standing alone is unlikely to support a reasonable inference of control[.]" *Voigt*, 2020 WL 614999, at *19; *accord Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *5 (Del. Ch. June 5, 2006) (noting that "board

---

[180] There are also instances where stockholders owning far more than 25% of the outstanding voting power were not controllers. *See, e.g.*, *In re Rouse Props., Inc.*, 2018 WL 1226015, at *20 (Del. Ch. Mar. 9, 2018) (concluding that a 33.5% holder did not "exercise[] influence over even the ordinary managerial operations of the company, much less exert[] *actual control* over a majority of the company's board" (emphasis in original) (internal quotation marks omitted)); *In re GGP, Inc., S'holder Litig.*, 2021 WL 2102326, *21–23 (Del. Ch. May 25, 2021) (concluding that a 35.3% holder did not have general control where there were no allegations that it could impose its will on a majority of the special committee, had a contractual right to dictate or veto board action, or could otherwise prevent the board from becoming fully informed), *aff'd in part, rev'd in part and remanded*, 282 A.3d 37 (Del. 2022); *In re Sea-land Corp. S'holders Litig.*, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987) (concluding that a 39.5% holder was not a controller where there were no allegations that the holder exercised actual domination or control over the company's board of directors); *Superior Vision*, 2006 WL 2521426, at *4–5 (concluding that a 44% holder was not a controller where there were no allegations that the holder dominated the board's corporate decision making process beyond the blockholder's refusal to waive a contractual prohibition on the payment of dividends).

[181] Pl.'s Answering Br. 71.

[182] *See* Pl.'s Answering Br. 66; Compl. ¶ 52.

veto power *in and of itself*" does not give rise to a stockholder's controlling status (emphasis in original)). But actual control has been found, or at least reasonably inferred, when a minority stockholder holds rights, through its equity stake or by contract, that confer control over the board either by blocking actions of the Board or making changes to the composition of the board. *See e.g., In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *21 (Del. Ch. Sept. 19, 2008) (finding control post-trial where minority stockholder had, among other things, "substantial blocking power" over corporate governance changes and major corporate transactions); *Tesla Motors*, 2018 WL 1560293, at *15 (noting CEO's supermajority voting rights over bylaw amendments as among factors leading to a pleadings-stage inference of control); *Williamson*, 2006 WL 1586375, at *5 (drawing pleadings-stage inference of control where minority stockholder had "the ability to shut down the effective operation of the [company's] board of directors by vetoing board actions"); *Tornetta*, 310 A.3d at 503 (finding control post-trial where CEO's equity block gave him "a sizable leg-up for stockholder votes generally," "the ability to block specific categories of bylaw amendments," and "great influence in the boardroom").

In *Voigt*, the court explained how a stockholder's blocking rights over decisions by the company's board may support an inference of general control:

> CD&R [held consent rights] to block actions that the Board otherwise would have the ability to take unilaterally, without stockholder approval. The consent rights encompassed both significant corporate and financing transactions, as well as more basic corporate governance

49

issues like increasing the size of the Board or amending the bylaws. These blocking rights weigh in favor of an inference that CD&R exercised control over the Company generally by giving CD&R power over the Company beyond what the holder of a mathematical majority of the voting power ordinarily could wield. The holder of a majority of the outstanding voting power could vote against transactions that required stockholder approval, but it could not exercise a stockholder level veto over actions that the board of directors could take unilaterally.

2020 WL 614999, at *19.

To assess AstraZeneca's blocking rights, it is important to review the actions that it can and cannot unilaterally block. Viela had a classified board at the time of the Merger.[183] Under the Viela Certificate, stockholders could remove directors only for cause and with the affirmative vote of 75% of the voting power of all outstanding shares entitled to vote in the election of directors.[184] Thus, AstraZeneca could unilaterally block any attempt by stockholders to remove a director for cause.

The same 75% supermajority vote is required for the stockholders to adopt, amend, or repeal any of the Company's bylaws.[185] If, however, the Board recommends in favor of a stockholder proposal to adopt, amend, or repeal the Company's bylaws, approval by only a majority of the voting power is required.[186]

---

[183] Viela Certificate Art. Sixth (B); Viela Bylaws Art. II § 1(C).

[184] Viela Certificate Art. Sixth (E).

[185] *Id*. Art. Seventh.

[186] *Id.*

The Viela Certificate also authorizes the Board to adopt, amend, or repeal the bylaws unilaterally, which AstraZeneca has no ability to block.[187]  In addition, the Viela Certificate requires a 75% supermajority vote of the stockholders to amend, alter, repeal, or adopt any provision that would be inconsistent with Articles Fifth through Twelfth of the Viela Certificate.[188]

AstraZeneca's equity position gave it limited blocking rights under the Viela Certificate.  Though these blocking rights are meaningful, they are not nearly as formidable as the blocking rights highlighted in other cases.  For example, unlike in *Voigt* where the defendants had the ability to block board decisions, AstraZeneca only had the right to veto bylaw amendments initiated by stockholders, and then only if the Board did not recommend them.  *Cf. Voigt*, 2020 WL 614999, at *3 (noting that the controller had "contractual consent rights over a wide range of significant corporate and finance matters," including increasing the size of the board, amending the company's bylaws, granting stock options, declaring dividends, adopting a liquidation plan, and divesting assets); *see also West Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 826 (Del. Ch. 2024) (noting that the

---

[187] *Id.*

[188] *Id*. Art. Tenth.

51

stockholder's consent rights required the board to obtain his prior approval for "virtually any action the directors might want to take").[189]

The supermajority voting requirements under the Viela Certificate gave AstraZeneca—by virtue of its 26.72% voting block—veto power over limited corporate actions, but as a whole, did not give AstraZeneca power to wield control over the Board or "operate[] the decision-making machinery of [Viela]." *Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016). Nor did AstraZeneca ever exercise its blocking rights. *Cf. Tornetta*, 310 A.3d at 503 (noting that the CEO exercised his veto rights to block bylaw amendments on two separate occasions).

## ii. Appointment of directors

Plaintiff alleges that AstraZeneca's designation of Soriot and Rivers to the Board further contributes to a finding of general control.[190] Both Soriot and Rivers were AstraZeneca executives when they served on the Board.[191] Soriot resigned

---

[189] *Moelis* addressed a facial challenge to the statutory validity of certain provisions of a stockholder agreement with the company's founder and CEO. 311 A.3d at 824, 829. The stockholder agreement gave the CEO consent rights over major board actions, including the amendment of the company's certificate of incorporation and bylaws, the issuance of preferred stock, the adoption of a stockholder rights plan, the entry into major corporate transactions such as mergers, liquidations, and asset sales, and the declaration of dividends. *Id.* at 825. In its opinion that invalidates the provisions, the court observed that their purpose was to "preserve [the CEO's] control, even if he sold enough shares that his voting power dropped below a mathematical majority, as it now has." *Id.* at 865.

[190] Pl.'s Answering Br. 67.

[191] Compl. ¶¶ 29, 31; AZ Defs.' Ex. 7 at 157.

from the Board on September 18, 2020, more than a month before Horizon submitted its initial, non-binding indication of interest on October 30.[192] Rivers was a member of the Board through the completion of the Merger.[193]

The "ability of an alleged controller to designate directors (albeit less than a majority) is an indication of control," *Voigt*, 2020 WL 614999, at \*14, but "does not, without more, establish actual domination or control." *Williamson*, 2006 WL 1586375, at \*4; *see also Frank v. Elgamal*, 2014 WL 957550, at \*22 (Del. Ch. Mar. 10, 2014) ("Merely because a director is nominated and elected by a large or controlling stockholder does not mean that he is necessarily beholden to his initial sponsor.").

AstraZeneca's prior designation of two directors on an eight-member board—only one of whom remained at the time the Board approved the Merger—is not a persuasive allegation of actual control over the Company and the Board. Plaintiff must plead facts that allow for a reasonable inference that AstraZeneca "dominate[d] the corporate decision-making process." *Rouse Props.*, 2018 WL 1226015, at \*13 (alteration in original) (internal quotation marks omitted). The Complaint contains no such allegations. Neither Soriot nor Rivers served on Viela's management team or chaired the Board. Soriot resigned even before Horizon delivered its initial offer

---

[192] Compl. ¶¶ 31, 76, 80.

[193] *Id.* ¶ 29.

to acquire the Company. *See Vaxart*, 2021 WL 5858696, at \*15 ("The question of control is measured at the time of the challenged transaction."); *GGP*, 2021 WL 2102326, at \*24 (determining the issue of control "at the time of the Transaction"). The Complaint's non-specific allegations as to Rivers fall short. For example, the Complaint alleges that Rivers "frequently acted on AstraZeneca's behalf . . . including [by] requesting confidential information for AstraZeneca's benefit, effectuating the transfer of shares of Viela stock between AstraZeneca entities, and . . . effectuat[ing] agreements between Viela and AstraZeneca."[194] These conclusory allegations do not support a reasonable inference that AstraZeneca "exercised actual domination and control" over the other directors or prevented them from exercising their independent judgment when making decisions regarding the Company or the Merger. *KKR*, 101 A.3d at 993 (internal quotation marks omitted).

The Complaint also alleges that Yao and the Non-AZ Directors, although not AstraZeneca designees, were susceptible to AstraZeneca's pressure and control.[195] Plaintiff alleges that Yao was beholden to AstraZeneca because AstraZeneca appointed him to his lucrative position at Viela where he "received over $4.2 million in golden parachute payments, including cash severance at three times Yao's then-

---

[194] *Id.* ¶ 30.

[195] *See id.* ¶¶ 58–59, 95, 98.

current base salary and target bonus."[196] The Complaint's bare allegations are not enough to reasonably infer that AstraZeneca exerted control over Yao. Yao received his cash severance payments from Viela, not from AstraZeneca.[197] There are no well-pleaded allegations that AstraZeneca controlled the terms of Yao's employment or the setting of his severance package. The Complaint also fails to allege any additional facts about Yao's employment at AstraZeneca or any "personal relationships" or "allegiance" to AstraZeneca. *See In re TrueCar, Inc. S'holder Deriv. Litig.*, 2020 WL 5816761, at \*24 (Del. Ch. Sept. 30, 2020) (concluding that an individual's prior employment with alleged controlling stockholder did not, "without more," create reason to doubt his independence); *Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 408 (Del. Ch. 1999) (noting that past employment with an interested party, "alone," is not enough to rebut independence); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 60 (Del. Ch. 2015) ("[I]t is unreasonable in my view to question [a director's] presumptive independence based solely on an employment relationship that ended in May 2011, almost three years before this action was filed[.]").

As to Cao, Hu, and Wicki, Plaintiff alleges that they were "particularly susceptible to AstraZeneca's pressure" because they were "executives or founders

---

[196] *Id.* ¶ 98.

[197] *See id.* ¶¶ 20, 98.

of investment funds that were early investors in AstraZeneca's spin-off of Viela."[198]

This conclusory allegation is makeweight. To overcome the presumption of director independence in the controller context, a plaintiff "must plead facts that support a reasonable inference the director is either beholden to the shareholder or so under its influence that his discretion is sterilized." *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *14 (Del. Ch. Aug. 16, 2021) (internal quotation marks omitted); *In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *7 (Del. Ch. Dec. 15, 2021) (explaining that the complaint must allege "facts as would demonstrate that through personal or other relationships [that] the directors are beholden to the controlling person"), *aff'd*, 282 A.3d 1054 (Del. 2022) (TABLE). "Bare allegations that directors are friendly with, travel in the same social circles as, or have past business relationships with the proponent of a transaction . . . are not enough to rebut the presumption of independence." *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

There are no well-pleaded allegations that the stockholders which designated Cao, Hu, and Wicki to the Board were beholden to AstraZeneca, let alone that Cao, Hu, and Wicki themselves were subject to AstraZeneca's control. The Complaint

---

[198] *See id.* ¶ 19.

56

does not allege that Boyu, 6 Dimensions, or HBM or their respective Board designees had, for example, future investment opportunities that would be forfeited if the Board did not approve the Merger. Absent well-pleaded allegations that Cao, Hu, and Wicki were beholden to AstraZeneca, their status as stockholder appointees does not compromise the presumption of independence. *See Berteau v. Glazek*, 2021 WL 2711678, at *21 (Del. Ch. June 30, 2021) ("Diao's mere status as Standard General's designee does not mean he is not independent."); *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) (noting that "even if American General nominated some of the outside directors or if Poulos and Hook jointly nominated them, such nomination, without more, does not mandate a finding that these directors were beholden to American General, Poulos, or Hook").

As to Jacques and Nolet, the Complaint is devoid of any well-pleaded allegations challenging their independence. Jacques and Nolet were not AstraZeneca designees, nor did they hold positions at Viela or AstraZeneca. Simply put, there are no allegations connecting Jacques or Nolet to AstraZeneca, let alone that they were beholden to AstraZeneca. *See Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) ("There must be some alleged nexus between the domination and the resulting personal benefit to the controlling party. Here, there are no well-pleaded allegations which allow the court to reasonably infer

57

that Goldsmith and Steele were in any way controlled by or financially beholden to [the alleged controller]." (footnote omitted)).

The Complaint lacks well-pleaded allegations to support a reasonable inference that Yao and the Non-AZ Directors were beholden to AstraZeneca and subject to its control. Even if the court were to accept that Yao lacked independence from AstraZeneca, that would still leave five independent directors on a seven-member Board at the time of the Merger. The lack of independence of two directors, on its own, does not support a reasonable pleadings-stage inference that AstraZeneca exercised actual control over the Board. *See Rouse Props.*, 2018 WL 1226015, at *13 ("[T]he lack of independence of two of the five Committee members cannot transform [the defendant] from minority blockholder to controlling stockholder."); *Morton's*, 74 A.3d at 660, 665 (concluding that the complaint failed to plead facts that a 27% blockholder, who placed two out of 10 directors on the board, one of whom served as *de facto* board chair, was a controller).

### iii. Management appointments

Plaintiff also alleges that AstraZeneca exerted actual control over Viela by "plant[ing] its own trusted executives" in all top five executive leadership positions.[199] Plaintiff does not attempt to allege facts to support the assertion that AstraZeneca's appointment of Viela's executives in 2018 translates to AstraZeneca

---

[199] *Id.* ¶ 41; Pl.'s Answering Br. 67.

58

exercising control over them in 2020. The Complaint merely alleges that the Viela executives were formerly AstraZeneca executives.[200] Allegations of prior employment or business relationships, without more, are insufficient to show control. *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."); *Vaxart*, 2021 WL 5858696, at *17 (concluding that "bare allegations of [a manager's] prior employment [with the controller] do not support" an inference of control). Here, Plaintiff does not allege any additional facts beyond prior employment, and "this bare assertion fails to sustain an inference of indebtedness, let alone control" over Viela's management. *Vaxart*, 2021 WL 5858696, at *18.

### iv.     The Support Agreements

Plaintiff alleges that the Support Agreements gave AstraZeneca "absolute" control over Viela's day-to-day business operations.[201] AstraZeneca, through the Support Agreements, supported several aspects of Viela's business functions, such as financial services, procurement activities, clinical operations, and laboratory,

---

[200] Compl. ¶ 41.

[201] *Id.* ¶¶ 6, 43; *see also* Pl.'s Answering Br. 70.

59

office, and supply access.[202]  Plaintiff alleges that "AstraZeneca's contracts and continued support were the lifeblood of Viela's business."[203]

This court's decision in *In re KKR Financial Holdings LLC Shareholders Litigation* is instructive.  101 A.3d 980.  In that case, KKR & Co. L.P. ("KKR") acquired KKR Financing Holdings LLC ("KFN").  *Id.* at 983.  The plaintiff argued that the transaction was subject to entire fairness review because KKR was a controlling stockholder, despite its owning less than 1% of KFN's equity.  *Id.*  The plaintiff argued that KKR controlled KFN by virtue of a "Management Agreement" that delegated management of KFN's day-to-day business operations to KKR Financial Advisors LLC ("KFA"), an affiliate of KKR.  *Id.*  Under the Management Agreement, KFA, and effectively KKR, was responsible for, among other things, "(i) selecting, purchasing and selling KFN's investments; (ii) KFN's financing and risk management; and (iii) providing investment advisory services to KFN."  *Id.* at 986.

The plaintiff alleged that KKR exerted actual control over KFN because of its unique business relationship, "largely defined by the terms of the Management Agreement."  *Id.* at 993.  In support of its actual control theory, the plaintiff also alleged that "KKR created KFN, KFN's officers are employees of KKR and its

---

[202] Compl. ¶ 43.

[203] *Id.* ¶ 45.

60

affiliates, KFN is admittedly completely reliant on KFA, KFN's primary asset and reason for existence is a portfolio that finances leveraged buyout activities of KKR, and KFN cannot extricate itself from KKR without paying a significant fee." *Id.* (cleaned up). The court, in granting the defendants' motion to dismiss, concluded that:

> [T]he allegations of the complaint do not support a reasonable inference that KKR was a controlling stockholder of KFN within the meaning of this Court's precedents. Although these allegations demonstrate that KKR, through its affiliate, managed the day-to-day operations of KFN, they do not support a reasonable inference that KKR *controlled the KFN board*—which is the operative question under Delaware law— such that the directors of KFN could not freely exercise their judgment in determining whether or not to approve and recommend to the stockholders a merger with KKR.

*Id.* (emphasis in original). The complaint did not contain any allegations that KKR could "dictate any action by the board, to veto any action of the board or to prevent the board from hiring advisors and gathering information in order to be fully-informed" about the challenged transaction. *Id*. at 994.

As in *KKR*, Viela substantially depended on AstraZeneca to support its business operations, including by providing products and services under the Support Agreements.[204] For instance, under the Clinical Supply Agreement, AstraZeneca provided Viela with a clinical supply of UPLIZNA, as well as other shipping and

---

[204] *Id.* ¶¶ 43–45.

61

distribution services.[205] But, as in *KKR*, Plaintiff has not alleged "facts from which it is reasonable to infer that [AstraZeneca] could prevent the [Viela Board] from freely exercising its independent judgment in considering the proposed [M]erger." *Id.* at 995. There are no well-pleaded allegations that AstraZeneca had the ability to dominate the Board's decision-making process as a result of the Support Agreements or Viela's operational dependence on AstraZeneca.[206]

To further support an inference that AstraZeneca exercised control over Viela through its "web of contracts," Plaintiff points to disclosures in Viela's public SEC filings that state that the Company was "substantially reliant" on AstraZeneca to manage its business operations and provide services under the Support Agreements.[207] This court has regarded an "outright admission" in public disclosures that a minority blockholder was a controlling stockholder to be persuasive evidence of control. *See In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *7–8 (Del. Ch. Nov. 26, 2014) (deeming an express admission in a company's public filings that a minority blockholder was a "controlling shareholder"

---

[205] Clinical Supply Agreement §§ 2.1, 2.3, 2.5 & Schedule 1; Compl. ¶ 44(d).

[206] Plaintiff suggests *KKR* is distinguishable because "no other indicia of control were alleged" aside from KFN's operational dependence on KKR. Pl.'s Answering Br. 76. But as discussed above, that was not the case. The plaintiff in *KKR* pointed to numerous allegations in support of its actual control theory, including that (i) "KKR created KRN;" (ii) "KRN's officers are employees of KKR and its affiliates;" and (iii) "KFN is admittedly 'completely reliant' on [KFA]." *KKR*, 101 A.3d at 993.

[207] Compl. ¶ 45; *see also* Viela FY20 Annual Report at 71.

as persuasive evidence of control), *rev'd on other grounds, In re Cornerstone Therapeutics Inc. S'holders Litig.*, 115 A.3d 1173 (Del. 2015).  The court, however, has distinguished outright admissions of control from disclosures that merely suggest a stockholder's "influence" over the company and its board of directors. *See, e.g., Rouse Props.*, 2018 WL 1226015, at *19 (noting that a disclosure that admits a minority blockholder "may exert influence" over the company is a "far cry from the outright admission" that a minority blockholder is the corporation's controller).  Public acknowledgements of a minority stockholder's influence over the company and its board of directors "bear on the controlling stockholder inquiry when coupled with [ ] other well-pled allegations" of control.  *Tesla Motors*, 2018 WL 1560293, at *19.

In *Tesla Motors*, the court, at the pleadings stage, considered disclosures in Tesla's public filings as part of its control analysis.  *Id.* at *18–19.  In its public filings, Tesla disclosed that CEO Elon Musk exerted a powerful influence over the company and its board of directors:

> [Tesla is] highly dependent on the services of Elon Musk, [who is] highly active in [the Company's] management, [and if Tesla were to lose his services, it could] disrupt our operations, delay the development and introduction of our vehicles and services, and negatively impact our business, prospects and operating results as well as cause our stock price to decline.

*Id.* at *19 (alterations in original) (internal quotation marks omitted).

63

Distinguishing Tesla's disclosures from those in *Zhongpin*, the court noted that neither Tesla nor Musk "expressly conceded that Musk is a controlling stockholder," and "if the public disclosures were all that Plaintiffs could point to as evidence of Musk's control, the pleading likely would come up short." *Tesla Motors*, 2018 WL 1560293, at \*19.[208] Aside from Tesla's public filings, the court concluded that the complaint contained well-pleaded allegations that Musk dominated the board's decision-making leading up to the challenged acquisition and a majority of the board was either interested in the transaction or lacked independence from Musk. *Id.* at \*16–18. As the court observed, "[a]ccording to the well-pled facts in the Complaint, there were practically no steps taken to separate Musk from the Board's consideration of the acquisition"—Musk brought the proposal to the board's attention, led the board's discussions regarding the acquisition, and was responsible for engaging the board's advisors. *Id.* at \*16.

---

[208] In *Zhongpin*, the company's annual report disclosed that its chairman and CEO, Xianfu Zhu, "beneficially owned approximately 17.3% of our outstanding shares of common stock" and "[a]s a result, pursuant to our By-laws and applicable laws and regulations, our *controlling shareholder* [ ] and our other executive officers and directors are able to exercise significant influence over our company . . . ." 2014 WL 6735457, at \*7 (emphasis added) (internal quotation marks omitted). The court concluded that "[w]hile the 10-K does not conclusively demonstrate Zhu's status as a controller under Delaware law, it does, along with the other allegations in the Complaint, support the inference that Zhu exercised significantly more power than would be expected of a CEO and 17% stockholder." *Id.* at \*8.

64

Viela's public filings do not contain an outright admission that AstraZeneca was a controlling stockholder. Similar to Tesla's disclosures about Musk, Viela's public filings describe how Viela is "substantially reliant" on AstraZeneca to provide certain business services, and the Company would face "operational difficulties" if AstraZeneca was unwilling or unable to continue to provide such services.[209] However, unlike in *Tesla Motors* where the complaint contained well-pleaded allegations of Musk's voting influence over and domination of Tesla's board of directors, the pleadings in this case fall short of alleging that AstraZeneca exercised actual control over the Viela Board.

Having considered all of the alleged elements of general control holistically, the court concludes that the Complaint does not allege well-pleaded facts to support a reasonable inference that AstraZeneca exercised general control over Viela and its Board. To be sure, Viela was contractually dependent upon AstraZeneca, though not on an exclusive basis, for a significant portion of its business operations in the wake of the spin-off. AstraZeneca's equity position was substantial and gave rise to unilateral veto power over stockholder-initiated bylaw amendments and any attempt to amend or repeal certain provisions of the Viela Certificate. But that power, along with AstraZeneca's lone board designee at the time of the Merger, did not give it

---

[209] Viela FY20 Annual Report at 71.

control over Board decisions or the Company generally.  Nor did AstraZeneca wield the potential power that it did have.  Thus, the allegations in the Complaint do not support a pleadings-stage inference of general control over Viela.

### b.    Did AstraZeneca exercise transaction-specific control over the Merger?

Plaintiff also alleges that AstraZeneca exercised transaction-specific control over the Merger by "threatening" to terminate the Support Agreements and to sell its equity stake in Viela unless the Company was sold.[210]  Plaintiff alleges that AstraZeneca "wielded its power through coercive pressure on the Board," which gave AstraZeneca transactional control over the Merger.[211]

Beginning with Yao, Plaintiff alleges that AstraZeneca retained "influence over" and "input into" Viela's sale process through periodic meetings and "constant backchannel communications" between Soriot and Yao.[212]  These conclusory allegations fail to establish how AstraZeneca exercised control over Viela's Board with respect to the Merger.  There are no well-pleaded allegations that Soriot

---

[210] Pl.'s Answering Br. 72–73.

[211] Compl. ¶ 53.

[212] Pl.'s Answering Br. 69; *see also* Compl. ¶ 83.

disclosed information about the Alexion Acquisition to Yao at these meetings or improperly influenced Viela's sale process.[213]

Turning his focus to Rivers, Plaintiff maintains that Rivers "act[ed] as a liaison between Yao/Viela and AstraZeneca throughout the sale process,"[214] and "obtained confidential valuations and descriptions of the sale process [from Goldman Sachs] for AstraZeneca's benefit."[215] The Complaint fails to allege how and to what extent Rivers was serving as a liaison between AstraZeneca and Viela or obtaining information for AstraZeneca's purported benefit during the sale process. Notably, minutes from the Board meetings during the sale process indicate that Rivers excused himself when the Board addressed matters involving AstraZeneca.[216]

With respect to the remainder of the Board, Plaintiff asserts that the Non-AZ Directors fell victim to a "controlled mindset" and allowed AstraZeneca to dictate

---

[213] Compl. ¶ 83. Minutes of the Company's Board meetings during the sale process indicate that the Board was informed about Yao's meetings with Soriot, as well as Yao's plans to "confidentially explore AstraZeneca's current view as a shareholder of various transaction scenarios in view of the Company's current progress" with Soriot. *See* AZ Defs.' Ex. 26 at VIE220_0000166.

[214] Compl. ¶ 83.

[215] *Id.* ¶ 30.

[216] *See* AZ Defs.' Ex. 26 at VIE220_0000166 (minutes from a November 13, 2020 Board meeting); AZ Defs.' Ex. 43 at VIE220_0000254 (minutes from a January 14, 2021 Board meeting).

67

the terms of the Merger.[217]  As discussed above, the Complaint lacks well-pleaded allegations that AstraZeneca generally controlled the Company or that a majority of the Board lacked independence from AstraZeneca.  The conclusory assertion that the Board labored under a controlled mindset "is not supported by any well-pleaded allegations that the [Non-AZ Directors] were beholden to [AstraZeneca] or that they suffered from any disabling personal interest." *City Pension Fund for Firefighters & Police Officers in City of Miami v. The Trade Desk, Inc.*, 2022 WL 3009959, at *15 (Del. Ch. July 29, 2022).

Plaintiff next alleges that AstraZeneca exercised transactional-specific control through management's creation of the October Projections "just one day after Horizon expressed interest in acquiring the Company."[218]  But the Complaint does not offer well-pleaded allegations that AstraZeneca had any involvement in the preparation of the October Projections.

Plaintiff's strongest argument in support of his transaction-specific control theory rests on the January 8 Letter.  Plaintiff characterizes the January 8 Letter as a "threat" to "disrupt Viela's operations by 'expeditiously' terminating all of its contracts with Viela" to pressure the Viela Board into a rushed, single-bidder sale

---

[217] Compl. ¶ 162.

[218] *Id.* ¶ 21; *see also id.* ¶ 104; Pl.'s Answering Br. 70.

process.[219] Plaintiff, relying primarily on *Basho* and *Voigt*, argues that AstraZeneca's threats "loom[ed] large" over the Merger and amounted to "coercion, domination and/or bullying" of Viela's Board.[220]

In *Basho*, the court acknowledged that "the existence of commercial relationships that provide the defendant with leverage over the corporation, such as status as a key customer or supplier" is a "possible source[] of influence that could contribute to a finding of actual control over a particular decision." 2018 WL 3326693, at *26. In that case, the alleged controlling stockholder had a contractual right to block outside financing, which was the "lifeline" of the "cash-burning, asset-light" company. *Id.* at *29. The stockholder exercised these rights multiple times, threatened to breach contractual obligations, and withheld loan funds from the company, "forc[ing] the [c]ompany into a financial crisis" by cutting off all financing besides the stockholder's proposal. *Id.* at *29–31. The stockholder also threatened members of the company's management if they did not comply with its demands and forced out two CEOs who tried to chart their own course. *Id.* at *32. In addition, the alleged controller used its board designees to spread misinformation and scare away potential investors. *See id.* at *31–32, *35. Through these tactics, the stockholder "creat[ed] a situation in which the [c]ompany had no other

---

[219] Pl.'s Answering Br. 70.

[220] *See* Pl.'s Answering Br. 72–73, & 73 n.272.

alternatives and no more money" and, therefore, "forced the [c]ompany to accept its deal." *Id.* at \*35. Following trial, the court found that the stockholder exercised control over the transaction, finding that the "actual control did not arise from any single factor, but rather from a confluence of multiple sources of influence." *Id.*

The facts and circumstances in this case are readily distinguishable from *Basho* and do not support a reasonable pleadings-stage inference of transactional control. AstraZeneca's actions are a far cry from the controller's conduct in *Basho*. Unlike in *Basho* where the controller exercised its contractual rights to block the company's financing, withheld funds, and threatened to fire management if they failed to comply with its demands, the January 8 Letter was a "proposal" to facilitate a business separation that had been in the works since Viela's IPO in October 2019.[221] The January 8 Letter laid out AstraZeneca's plan to collaborate with Viela to "ensur[e] [its] business continuity" and put it in "the best position" moving forward.[222] Notably, AstraZeneca did not mention the sale of its own block of Viela stock in the January 8 Letter.[223]

---

[221] January 8 Letter at 1 ("As you know, this is a journey that is already well advanced and, *since the IPO of Viela, we have been working steadily to complete the separation of the businesses.*" (emphasis added)).

[222] *Id.*

[223] Plaintiff alleges that the January 8 Letter did not mention the sale of AstraZeneca's block of Viela shares because AstraZeneca had "already made this point clear to the Viela Board." Compl. ¶ 90; *see also id.* ¶¶ 12, 76, 143 (alleging that AstraZeneca had "privately

AstraZeneca did not threaten to terminate the Support Agreements or otherwise abandon Viela in the January 8 Letter. A close examination of the Support Agreements reveals that AstraZeneca only had an express right to terminate the Clinical Supply Agreement for convenience, which was subject to a lengthy notice and winddown period.[224] Both Viela and AstraZeneca had the right to terminate the Commercial Supply Agreement for convenience, which was subject to a similar notice and winddown period as the Clinical Supply Agreement.[225] Viela, but not AstraZeneca, had a right to terminate the TSA, License Agreement, and MSDSA for convenience.[226] Viela was also permitted to seek alternative suppliers under the MSDSA.[227]

Another critical distinction from *Basho* is that AstraZeneca did not place Viela in the position of having "no other alternatives" other than to facilitate the Company's sale to Horizon. *Cf. Basho*, 2018 WL 3326693, at *29 ("By exercising

---

made clear" to the Board that it would divest its Viela shares unless the Company was sold). Beyond these statements, the Complaint does not point to any communications to support these conclusory allegations.

[224] Clinical Supply Agreement § 19.2(d). AstraZeneca had the right to terminate the Clinical Supply Agreement for convenience upon providing at least 30 months' written notice to Viela. *Id.*

[225] Commercial Supply Agreement § 19.2(d). Either party had to provide at least 36 months' written notice in order to terminate the Commercial Supply Agreement for convenience. *Id.*

[226] TSA § 7.2.1; License Agreement § 6.2.4; MSDSA § 15.4.

[227] MSDSA § 1.3.

its contract rights in this fashion, [the controller] forced the [c]ompany into a financial crisis [with] no other alternatives."); *see also Skye Mineral*, 2020 WL 881544, at \*26–27 (drawing a pleadings-stage inference of control where the alleged controllers "participated in a concerted effort to place the [company] in a precarious financial condition" and "then exercised their leverage with the Blocking Rights to steer [the company] off the cliff into the bankruptcy ravine below"). Plaintiff presents a non-linear timeline to suggest that AstraZeneca's threatened actions coerced the Board into pursuing the Merger. When viewing the facts sequentially, Plaintiff's allegations are "temporally untethered" from the timeline of events and do not support an inference of control. *See Vaxart,* 2021 WL 5858696, at \*19 (rejecting the plaintiff's claim against a director's independence in part because it was "temporally untethered").

A brief discussion of the timeline is appropriate. Viela and Horizon were engaged in partnership discussions as early as July 2020, a month before Soriot even inquired about Alexion's potential interest in a business combination with AstraZeneca.[228] On September 18, 2020, the Board resolved to retain Goldman Sachs as "a financial advisor, in part, to sell the Company."[229] Plaintiff admits that there is "no record" that Soriot disclosed the Alexion Acquisition discussions to

---

[228] Compl. ¶¶ 11, 81.

[229] *Id.* ¶ 11.

Viela's Board when it approved the engagement of Goldman Sachs.[230] Therefore, it is not reasonably conceivable that the Board was influenced, let alone threatened, by AstraZeneca at this point, yet Viela was already pursuing a potential business collaboration with Horizon.

From September to November 2020, the Board solicited offers from other potential partners, held regular meetings with Goldman Sachs and Mintz Levin to discuss acquisition opportunities, and reviewed and rejected two proposals from Horizon. On November 17, the Board agreed to Horizon's offer price of $53.00 per share, a fact that is not in dispute.[231] As the parties were moving toward a December 11 signing date, however, Horizon began experiencing supply chain issues, and the acquisition discussions were put on hold.[232] During this time, the Board decided not to terminate discussions with Horizon, but instead to seek alternative proposals from the remaining entities in Project Zenith.[233] In the meantime, AstraZeneca announced the Alexion Acquisition, which was subject to a "hell or high-water clause."[234]

---

[230] *Id.* ¶ 62.

[231] *Id.* ¶ 84; *see also* Viela Schedule 14D-9 at 18.

[232] Compl. ¶ 13.

[233] AZ Defs.' Ex. 40 at VIE220_0003131.

[234] AZ Defs.' Ex. 36 § 8.02(e).

It is not until January 8, 2021, that Plaintiff alleges that AstraZeneca "threatened" to abandon Viela.[235] Plaintiff relies heavily on one specific line of the January 8 Letter: "steps . . . will need to be taken to finalise [sic] the separation of Viela . . . from AstraZeneca . . . *as expeditiously as possible*."[236] Plaintiff claims that the January 8 Letter threatened to terminate the Support Agreements, pressuring Viela's Board into an expedited sale process due to the Company's operational dependence on AstraZeneca.[237]

Based on the unscrambled timeline of events, it is not a reasonable inference that AstraZeneca exerted control to threaten Viela's Board into pursuing and ultimately approving the Merger. At the time AstraZeneca delivered the January 8 Letter, the Company had already been in months-long negotiations with Horizon, and the parties had reached an agreement on the $53.00 share price almost two months before.[238] Plaintiff's characterization of the deal process as rushed falls flat when considering the status of the transaction before Horizon temporarily paused

---

[235] *See* Compl. ¶¶ 15, 88; *see also* Pl.'s Answering Br. 86 (arguing that AstraZeneca's "threats were made in January 2021").

[236] January 8 Letter at 1 (emphasis added); *see* Pl.'s Answering Br. 73.

[237] *See* Compl ¶ 14; *see also id.* ¶ 17 ("AstraZeneca wielded its power to channel the remaining directors into a position where they had no option other than to facilitate a sale of the Company."); *id.* ¶ 90 ("[T]he rest of the Board understood that AstraZeneca's exit plan was meant to force an acquisition of Viela.").

[238] *Id.* ¶ 84.

the discussions.[239] Once Horizon worked out its supply chain issues, the parties picked up where they left off and finalized the deal. There are no allegations that there were any material changes in the Company or its value between the time that the Board had agreed to the $53.00 share price in November and the date that the Board voted to approve the transaction in January. Nor are there any allegations that AstraZeneca played any role in bringing Horizon back to the table. *Cf. Tesla Motors*, 2018 WL 1560293, at *16 (explaining that Musk brought the acquisition proposal to Tesla's board of directors "not once, not twice, but three times" and was actively involved in discussions with the board and the board's advisors about the acquisition). In fact, Plaintiff himself characterizes Horizon's reemergence in January as a "lucky break" for AstraZeneca.[240] Perhaps so. But it also undermines Plaintiff's entire theory that AstraZeneca exercised control to force Viela into the Merger.

Taking the allegations in the Complaint as a whole and viewing them in a light most favorable to Plaintiff, it is not reasonably conceivable that AstraZeneca exercised general control over Viela or that it exercised transaction-specific control

---

[239] *Id.* ¶ 16 (alleging that Viela's discussions with Horizon "abruptly resumed" and "[j]ust two weeks later, the Board agreed to the [Merger]"). Notably, at the time Horizon put the negotiations on hold, the parties had been contemplating an announcement of their deal by December 14. AZ Defs.' Ex. 32 at VIE220_0000234. In addition, Horizon's initial offer on October 29 proposed the execution of a definitive agreement in less than a month's time. *See* AZ Defs.' Ex. 22 at VIE220_0000571.

[240] Pl.'s Answering Br. 86.

over the Company or its Board in connection with the Merger. Accordingly, the claims against AstraZeneca must be dismissed because "[a] stockholder that does not control the corporation is not a fiduciary and cannot be held liable for breaching non-existent duties." *Voigt*, 2020 WL 614999, at *10.

## C.    Does the Complaint State a Claim Against Viela's Board for Breach of Fiduciary Duty?

Plaintiff separately asserts breach of fiduciary duty claims against Soriot, Rivers, Yao, and the Non-AZ Directors (the "Director Defendants"). The Director Defendants argue that the fiduciary duty claims must be dismissed under *Corwin* because a fully informed, uncoerced, and disinterested majority of Viela's stockholders tendered their shares.[241] The Director Defendants also argue that, even if *Corwin* does not apply, the Complaint does not state a claim for breach of fiduciary duty on the merits.[242]

When determining whether corporate fiduciaries have breached their duties, the court's analysis begins with identifying the applicable standard of review. *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 737 (Del. Ch. 2016), *aff'd*, 145 A.3d 697 (Del. 2017) (TABLE). "Delaware has three tiers of review for evaluating director decision-

---

[241] *See* AZ Defs.' Opening Br. 56; Director Defs.' Opening Br. 18–20.

[242] *See* AZ Defs.' Opening Br. 56–60; Director Defs.' Opening Br. 35.

making:  the business judgment rule, enhanced scrutiny, and entire fairness." *Chen*, 87 A.3d at 666 (citing *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)).

"In a suit claiming that a controlling stockholder stood on both sides of a transaction with the controlled corporation and received a non-ratable benefit, entire fairness is the presumptive standard of review." *In re Match Gp., Inc. Deriv. Litig.*, 2024 WL 1449815, at * 1 (Del. 2024); *Voigt*, 2020 WL 614999, at *10.  But because it is not reasonably conceivable that AstraZeneca was a controlling stockholder, entire fairness is not "the operative standard for purposes of the motion to dismiss." *Voigt*, 2020 WL 614999, at *10.

Since the Merger was a change of control transaction in which Viela's stockholders received cash for their shares, enhanced scrutiny under *Revlon* presumptively applies.  *Volcano*, 143 A.3d at 737; *see also Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994) ("[A] sale of control impose[s] special obligations on directors of a corporation.  In particular, they have the obligation of acting reasonably to seek the transaction offering the best value reasonably available to the stockholders.  The courts will apply enhanced scrutiny to ensure that the directors have acted reasonably." (footnote omitted)).  The Director Defendants argue that the business judgment rule applies because the Merger is subject to cleansing under *Corwin*.

77

"*Corwin* gives rise to the irrebuttable presumption of the business judgment rule when a transaction is approved by a fully informed, uncoerced vote of the disinterested stockholders." *Kihm v. Mott*, 2021 WL 3883875, at \*10 (Del. Ch. Aug. 31, 2021) (internal quotation marks omitted), *aff'd*, 276 A.3d 462 (Del. 2022). "[T]he effect of [an] uncoerced, informed stockholder vote is outcome-determinative, even if *Revlon* applied to the merger." *Corwin*, 125 A.3d at 308. "Stockholder approval of a merger under Section 251(h) by accepting a tender offer has the same cleansing effect as a vote in favor of that merger." *Volcano*, 143 A.3d at 738; *see also Larkin v. Shah*, 2016 WL 4485447, at \*20 (Del. Ch. Aug. 25, 2016) (applying *Corwin* to a completed first-step tender offer in a Section 251(h) merger); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at \*32 (Del. Ch. Oct. 16, 2018) ("[W]hen the holders of a majority of a company's shares make a fully informed, disinterested, and uncoerced decision to tender into a medium-form merger under Section 251(h), the business judgment rule applies."), *aff'd,* 211 A.3d 137 (Del. 2019) (TABLE). If *Corwin* cleansing applies, the plaintiff's only remaining basis to challenge the transaction is to assert a claim for waste. *Volcano*, 143 A.3d at 749–50; *see also Larkin,* 2016 WL 4485447, at \*21 (dismissing fiduciary duty claims under *Corwin* because plaintiff did not plead a claim for waste); *Rouse Props.*, 2018 WL 1226015, at \*25 (same).

78

In the absence of a controller, to avoid the application of the business judgment rule under *Corwin*, the plaintiff "must plead facts from which it reasonably can be inferred that [the company's] stockholders were interested, coerced, or not fully informed" when accepting the tender offer. *Volcano*, 143 A.3d at 747; *see also Voigt*, 2020 WL 614999, at *10 ("If it is not reasonably conceivable that the defendant controlled the company, then under *Corwin*, an irrebuttable version of the business judgment rule will govern unless the plaintiff can plead a reasonably conceivable breach of the duty of disclosure." (cleaned up)). Here, the Complaint alleges that the Company failed to disclose and omitted material information regarding the Merger in its Schedule 14D-9.[243] Plaintiff does not allege that Viela's stockholders were interested or otherwise coerced into tendering their shares.

"A plaintiff alleging that a stockholder vote was inadequately informed to cleanse a transaction must 'identify a deficiency in the operative disclosure document,' which shifts the burden to the defendants to show that 'the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote.'" *In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017) (quoting *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017)). At the motion to dismiss stage, the plaintiff "only needs to

_____

[243] *See* Compl. ¶¶ 119–26; *see also* Pl.'s Answering Br. 94–103.

79

plead the existence of one disclosure violation" to defeat *Corwin* cleansing. *Goldstein v. Denner*, 2022 WL 1671006, at *19 (Del. Ch. May 26, 2022) (citing *In re Mindbody, Inc. S'holders Litig.*, 2020 WL 5870084, at *26 (Del. Ch. Oct. 2, 2020)). "The operative question is whether the complaint 'supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading.'" *Id.* at *20 (quoting *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018)). "This inquiry is necessarily fact-intensive, and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law." *Kihm*, 2021 WL 3883875, at *11 (internal quotation marks omitted).

> As the Delaware Supreme Court recently recapitulated:
>
> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Framed differently, an omitted fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. But, to be sure, this materiality test does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.

*City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc.*, 314 A.3d 1108, 1131 (Del. 2024) (internal quotation marks omitted). The court assesses materiality "from the viewpoint of a 'reasonable' stockholder." *Id.* "Omitted facts, however, are not rendered 'material simply because they might be

80

helpful.'" *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *6 (Del. Ch. June 27, 2008) (quoting *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000)).

"Just as disclosures cannot omit material information, disclosures cannot be materially misleading." *Morrison*, 191 A.3d at 283. "[O]nce defendants travel[] down the road of partial disclosure of the history leading up to the Merger . . . they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994). Delaware law, however, "does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information." *Id.* at 1280; *see also Solomon v. Armstrong*, 747 A.2d 1098, 1130 (Del. Ch. 1999) ("Our cases have held that directors should not be forced to bury the shareholders in an avalanche of trivial information." (cleaned up)), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE). The court's assessment of materiality "requires a careful balancing of the potential benefits of disclosure against the possibility of resultant harm" from overdisclosure. *Arnold*, 650 A.2d at 1279; *accord Teamster Members Ret. Plan v. Dearth*, 2022 WL 1744436, at *12 (Del. Ch. May 31, 2022), *aff'd*, 289 A.3d 1264 (Del. 2023) (TABLE).

The Complaint identifies four alleged deficiencies in the Schedule 14D-9 disclosures that, in Plaintiff's view, preclude the application of *Corwin*. This opinion addresses each in turn.

### 1. AstraZeneca's "threats" to terminate the Support Agreements and sell its Viela stock

Plaintiff alleges that the Schedule 14D-9 omitted "AstraZeneca's communicated abandonment and exit plan and the accompanying threats AstraZeneca made to the Board that it would sell its stock absent a sale of the Company."[244] Specifically, Plaintiff argues that the Company failed to disclose AstraZeneca's "threats" in the January 8 Letter and the Board's discussion of it, including Nolet's January 14 email suggesting that Viela might have to find a buyer for AstraZeneca's Viela stock "if other events don't occur first."[245] The Director Defendants contend that the omissions are not material because the January 8 Letter does not support a reasonable inference that AstraZeneca threatened to abandon the Company or sell its Viela stock if a sale was not effectuated, and the Board was thus not pressured to take a specific course of action.[246]

As discussed earlier in this opinion, the January 8 Letter did not contain an actual or implied threat from AstraZeneca to terminate the Support Agreements, to

---

[244] Compl. ¶ 120.

[245] *Id.*

[246] Director Defs.' Opening Br. 21–24; Director Defs.' Reply Br. 2–6.

sell its Viela shares, or to otherwise abandon Viela. To the contrary, the January 8 Letter outlined a collaborative business proposal to finalize AstraZeneca's separation from Viela, which had been in process long before the Horizon discussions began.[247] The January 8 Letter stated that AstraZeneca, during the transition phase, will "complete all remaining services" or otherwise "assist [Viela with] transitioning" all remaining services under the terms of the TSA, the Clinical Supply Agreement, the Commercial Supply Agreement, and MSDSA[248]—a far cry from a threat to terminate these contracts on an expedited basis as Plaintiff alleges.[249]

Although the January 8 Letter indicated that AstraZeneca wished to achieve full separation from Viela "as expeditiously as possible," it also emphasized the importance of "ensuring [Viela's] business continuity," placing "[Viela] and any potential acquirer into the best position either to move forward as a fully independent company or to integrate [Viela's] business in the event of an acquisition," and completing the separation "in the smoothest and most efficient manner."[250] To achieve these objectives, the January 8 Letter proposed that AstraZeneca and Viela

---

[247] January 8 Letter at VIE220_0003472 (noting that AstraZeneca and Viela have been working to complete the separation of their businesses since Viela's IPO in October 2019).

[248] *Id.* at VIE220_0003473.

[249] Pl.'s Answering Br. 95.

[250] January 8 Letter at VIE220_0003473–75.

work "in close collaboration."[251] A proposal that provides avenues for business continuity and seeks collaboration with a business partner during a transition phase does not support a reasonable inference that the underlying business relationship is being abandoned.

Plaintiff analogizes this case to *Morrison*, 191 A.3d 268.[252] There, Ray Berry, the company's founder and a significant stockholder, communicated to the board that he believed it was "in the best interests of the shareholders for the board to pursue a sale of the company at this time due to the low valuation of the company" and that if the company remains public, Berry would "give serious consideration to selling his stock when permitted as he does not believe [the company] is well positioned to prosper as a public company and he can do better with his investment dollars elsewhere." *Id.* at 281 (internal quotation marks omitted).[253]

The plaintiff argued that the company failed to disclose Berry's "threat" in its SEC filings. *Id.* Our Supreme Court held that the information was material because "[a] reasonable stockholder would want to know the rationale that Ray Berry gave the [b]oard in encouraging it to pursue the sale, as well as his communication of his intent to sell his shares if a transaction were not consummated." *Id.* at 287. Although

---

[251] *Id.* at VIE220_0003472.

[252] Pl.'s Answering Br. 96–97.

[253] At the time of the challenged transaction, Berry and his son, collectively, owned 9.8% of the company's shares. *Morrison*, 191 A.3d at 273.

the Court did not embrace the plaintiff's characterization of the email as a "threat," it viewed the email to be an "economically relevant statement of intent," which the company's board failed to disclose. *Id.* at 286.

Unlike in *Morrison*, the Complaint does not support a rational inference that material facts were not disclosed. Berry's rationale for encouraging the company's board to pursue a sale was evident from his emails with counsel, and the court held that the company altered the total mix of information available to the stockholders by failing to disclose those communications. *See id.* at 287. That is not the case here. Plaintiff alleges that AstraZeneca threatened to "expeditiously divest its shares and terminate its involvement with the Company" unless a sale was effectuated, relying primarily on the January 8 Letter.[254] The plain language of the January 8 Letter, however, belies any reasonable inference that AstraZeneca threatened to terminate any of the Support Agreements or abandon Viela. Moreover, at the time AstraZeneca delivered the January 8 Letter, Viela and Horizon had already been engaged in a months-long sale process, had reached an agreement on the per share sale price, and had been exchanging drafts of the merger agreement. The process stalled due to Horizon's supply chain issues, but restarted in mid-January. Once the parties re-engaged, the deal was finalized less than two weeks later at the same share

---

[254] Compl. ¶ 121.

85

price. There are no allegations that Viela's financial prospects or value had changed in the intervening period. Thus, based on these factual allegations, it is not reasonably conceivable that the Board was pressured to pursue a sale of the Company or was unable to independently decide whether to approve the sale in response to AstraZeneca's actions. *Cf. Morrison*, 191 A.3d at 276 (noting that Berry communicated his intention to sell his equity absent a sale of the company prior to the sale process officially beginning).

Under the facts of this case, information about AstraZeneca's January 8 Letter or the potential for AstraZeneca to dispose of its Viela stock if a sale did not occur was not material, and the Board did not have an obligation to disclose it.

### 2. AstraZeneca's "intent to terminate" material contracts

Plaintiff next alleges that AstraZeneca's January 8 Letter "provided written notice of its intention to cancel, terminate or suspend performance" of the Support Agreements, rendering the disclosures about Viela's material contracts in the Schedule 14D-9 false or materially misleading.[255] The Schedule 14D-9 stated that, as of the date of the Merger Agreement, "no party to any Material Contract has given [] written notice of its intention to cancel, terminate or suspend performance under any Material Contract."[256] The Support Agreements are listed as "Material

---

[255] *Id.* ¶ 122.

[256] *Id.* (emphasis and internal quotation marks omitted); *see* Merger Agreement § 3.17(d).

86

Contracts" in the Company's Disclosure Letter to the Merger Agreement (the "Disclosure Letter").[257]

Plaintiff's allegations are refuted by the contents of the January 8 Letter. The January 8 Letter does not state that it is a notice of intention to cancel, terminate, or suspend performance of the Support Agreements. Rather, it is a proposal to complete or otherwise transition AstraZeneca's obligations under the Support Agreements. The January 8 Letter states that AstraZeneca "proposes to *complete all remaining services* in accordance with the terms of the TSA."[258] The January 8 Letter also outlines AstraZeneca's proposal to "*complete all remaining services under all active Service Schedules* to the extent they are currently planned to be completed by the end of Q2 2021" and "assist [Viela] in *transitioning all other remaining services* (as well as any *additional future service needs* [Viela] may have)" under the Clinical Supply Agreement, the MSDSA, and the Commercial Supply Agreement.[259]

Plaintiff excerpts portions of Annex A to the January 8 Letter in the Complaint, but Annex A does not separately provide a notice of intention to cancel, terminate, or suspend performance of the Support Agreements. Instead, Annex A

---

[257] Disclosure Letter at VIE220_0002528–29.

[258] January 8 Letter at VIE220_0003473 (emphasis added).

[259] *Id.* (emphasis added).

contains "a plan detailing what [AstraZeneca] believes are the required steps to implement the Proposal,"[260] including the delivery of "AstraZeneca's notice of termination of the Commercial Supply Agreement,"[261] amendments to the TSA, MSDSA, Clinical Support Agreement, and the Commercial Supply Agreement, and cooperative arrangements between Viela and AstraZeneca to mutually terminate certain license agreements.[262]

The full contents of the January 8 Letter do not support a reasonable inference that AstraZeneca provided notice of its intent to cancel, terminate, or suspend performance of the Support Agreements.[263] The disclosures in the Schedule 14D-9 about the Company's material contracts were neither false nor materially misleading.

### 3. The June 2020 Projections

Plaintiff next alleges that the failure to disclose the June Projections in the Schedule 14D-9 was a material omission.[264] Plaintiff alleges the June Projections,

---

[260] *Id.* at VIE220_0003472.

[261] *Id.* at VIE220_0003476.

[262] *Id.* AstraZeneca and Horizon negotiated amendments to the TSA, Commercial Supply Agreement, and MSDSA following the closing of the Merger. *See* AZ Defs.' Exs. 57, 63.

[263] The Disclosure Letter states that the January 8 Letter "is a planning document, and *no contractual notice of termination of any contract between the parties, including the Commercial Supply Agreement, has been received.*" Disclosure Letter at VIE220_0002536 (emphasis added).

[264] Compl. ¶ 124; Pl.'s Answering Br. 100.

88

which had been prepared in the ordinary course of business, were later slashed in the October Projections "to persuade the Board (and ultimately stockholders) to accept the price obtained via a rushed, single-bidder process," with Horizon.[265] Goldman Sachs used the October Projections in its financial analyses and in preparation of its Fairness Opinion.[266]

"Delaware law recognizes the value of projections to stockholders considering a cash-out transaction." *Kihm*, 2021 WL 3883875, at *14. As the court observed in *PNB*:

> In the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate. After all, the key issue for the stockholders is whether accepting the merger price is a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company.

2006 WL 2403999, at *15. The court further observed:

> Even in the cash-out merger context, though, it is not our law that every extant estimate of a company's future results, however stale or however prepared, is material. Rather, because of their essentially predictive nature, our law has refused to deem projections material unless the circumstances of their preparation support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment.

---

[265] Pl.'s Answering Br. 100. *Compare* Compl. ¶ 102 ("When updating for the June Projections, Viela management used the Company's best, most updated, and most reliable information."), *with id.* ¶ 105 ("The October Projections were not prepared under ordinary business conditions and were not prepared for operational purposes.").

[266] *See* Compl. ¶ 110.

*Id.* at \*16.  Put another way, the key question is whether the projections are reliable. *Id.*; *see Goldstein*, 2022 WL 1671006, at \*26 ("Projections must be 'reliable' to merit disclosure.").  "As a general rule, management projections made in the ordinary course of business are reliable." *Kihm*, 2021 WL 3883875, at \*14 (citing *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at \*7 (Del. Ch. Dec. 31, 2003), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005)).  "While reliability is a prerequisite to materiality, it does not equate to materiality.  Even reliable projections need not be disclosed if it is unlikely that doing so would 'significantly alter[ ] the total mix of information' available to stockholders." *Id.* at \*15 (alteration in original) (quoting *Morrison*, 191 A.2d at 283).  The court "make[s] case-by-case determinations about what information is material [based] on the facts presented." *Goldstein*, 2022 WL 1671006, at \*27.

Viela's management prepared the June Projections without any existing sales history for UPLIZNA, which the FDA approved on June 11.[267]  The June Projections forecasted (i) total cumulative revenues of $1.064 billion; (ii) total cumulative operating expenses of $914 million; and (iii) total cumulative operating income of $130 million for the period from 2021 to 2024.[268]  At that time, management anticipated that there would be 85 prescriptions of UPLIZNA sold by the end of

---

[267] *Id.* ¶ 71.

[268] Director Defs.' Ex. K at VIE220_0002986; Compl. ¶¶ 100, 110.

90

2020 and that the Company would generate $18 million in revenue from UPLIZNA in 2020.[269]

The October Projections, which were prepared by management after Viela launched UPLIZNA and presented to the Board at its October 30, 2020 meeting, (i) lowered the Company's total revenue forecast to $828 million; (ii) increased the Company's total operating expenses forecast to $1,130 million; and (iii) predicted $355 million of operating losses for the same period.[270] The October Projections also reduced the forecasted net revenue for UPLIZNA from $18 million to $11 million for 2020.[271]

The Director Defendants argue that the June Projections did not need to be disclosed because they were stale and no longer reliable.[272] They point to the minutes and materials from the Board's October 30, 2020, meeting explaining how the Company was dealing with "significant changes" from the ongoing COVID-19 pandemic, including fewer patient visits, hesitation by providers to change treatment plans during virtual appointments, and clinical trial delays.[273] The Director

[269] Director Defs.' Ex. K at VIE220_0002957–58.

[270] Director Defs.' Ex. L at VIE220_0003088; Compl. ¶¶ 104, 110.

[271] *Compare* Director Defs.' Ex. K at VIE220_0002986, *with* Director Defs.' Ex. L at VIE220_0003088.

[272] Director Defs.' Opening Br. 29.

[273] Director Defs.' Reply Br. 10; *see* Director Defs.' Ex. L at VIE220_0003041; *id.* at VIE220_0003074.

Defendants also note that Viela's Form 10-Q for the period ending September 30, 2020, filed with the SEC on November 10, 2020, indicated that between June 2020 and the end of September 2020, Viela only filled approximately 20 prescriptions of UPLIZNA,[274] while management forecasted the sale of 85 prescriptions for 2020 in the June Projections. In its Form 10-Q, the Company also reported ongoing delays in the clinical trials for its other pharmaceutical drugs.[275] Thus, the Director Defendants insist that it is not a reasonable inference that the October Projections were prepared "suddenly [and] without justification" or without use of the Company's "best, most updated, and most reliable information."[276]

To bolster his argument that the June Projections were material, Plaintiff also alleges that Wall Street analysts' valuations of the Company "generally established price targets well above the $53.00 per share [Merger] price."[277] Plaintiff points to the $60.00 per share price targets prepared by the Wall Street analysts.[278] The Director Defendants respond that those targets were dated as of November 2, 2020, and based on stale information from August 12 to October 26, 2020.[279] At the

---

[274] Director Defs.' Reply Br. 10; *see* Director Defs.' Ex. I at 20.

[275] Director Defs.' Ex. I at 19.

[276] Director Defs.' Opening Br. 29–30.

[277] Compl. ¶ 117.

[278] *Id.*

[279] *See* Director Defs.' Reply Br. 11; *see* Director Defs.' Ex. M at VIE220_0000142.

November 13 Board meeting, Goldman Sachs presented an updated summary of the Wall Street analysts' valuations, which were prepared after the Company's release of its quarterly financials.[280] Goldman Sachs reported that the analysts' median price target was $52.00, a reduction from the $60.00 per share price target presented at the November 3 Board meeting.[281] Contrary to Plaintiff's allegations, Wall Street analysts, similarly, updated their valuation targets.

The circumstances that led the court in *Chester County Employees' Retirement Fund v. KCG Holdings, Inc.* to conclude that it was reasonably conceivable that earlier, undisclosed financial projections were material are not present here. 2019 WL 2564093 (Del. Ch. June 21, 2019). In *KCG*, the company's board of directors had a set of earlier, more optimistic projections that: (1) the directors used in negotiating the merger; (2) management had vetted; and (3) the financial adviser had affirmed. *Id.* at *14. After the board had agreed to the merger price and the CEO had negotiated the terms of post-closing compensation for himself and his management team, the CEO drastically reduced the company's financial forecasts. *Id.* at *7–8. The other directors approved the revised projections via email that same evening, and the company's financial adviser delivered a revised fairness

---

[280] *See* Director Defs.' Ex. N at VIE220_0000174.

[281] *See id.* All but two analysts lowered their price targets. These two analysts maintained price targets of $50 and $55 per share. *Id.*

opinion at 5:05 a.m. the next morning. *Id.* at *8–9. The board approved the transaction within two hours of receiving the revised fairness opinion. *Id.* at *9. The court was persuaded that the circumstances surrounding the preparation of the revised projections cast doubt on their reliability and concluded that "it is reasonably conceivable the earlier projections and the circumstances surrounding the preparation of the Revised Projections would have been viewed as material and should have been disclosed." *Id.* at *14.

The court in *Goldstein* reached a similar conclusion. There, management revised the company's financial forecasts two weeks after the board agreed to the transaction price and four days before the board formally approved the transaction. 2022 WL 1671006, at *27. The revised forecasts "reduced the Company's internal estimate of standalone value by one-third, bringing the valuation just below the Transaction price." *Id.* Based on these allegations, the court concluded that the updated forecasts should have been disclosed to the stockholders. *Id.*; *but see Dearth*, 2022 WL 1744436, at *15–17 (distinguishing *KCG* and *Goldstein* and concluding that the company did not have an obligation to disclose an EBITDA adjustment that was prepared after the board rejected a bidder's offer to purchase the company and while no other active bids were being considered).

In this case, the circumstances surrounding the preparation of the October Projections do not raise the same concerns about their reliability and materiality as

94

in *KCG* and *Goldstein*. When Viela's management prepared the October Projections, the Company had not yet agreed to a transaction with Horizon, or even to a merger price. Indeed, the October Projections were dated as of October 23, 2020, one week before Horizon delivered its initial $44.00 per share non-binding indication of interest.[282] The Board, after receiving the October Projections on October 30, then proceeded to reject not one, but two offers from Horizon before agreeing to the $53.00 per share price on November 17.[283]

Unlike in *KCG Holdings* and *Goldstein*, the allegations in the Complaint do not support a reasonable inference that Viela's management cut the financial forecasts to justify the Merger price. *Cf. KCG*, 2019 WL 2564093, at \*14 (highlighting that the CEO's management team "created the Revised Projections at the last minute—after the Board approved the $20 per share price, and after [the CEO] secured satisfactory compensation" from the buyer); *Goldstein*, 2022 WL 1744436, at \*1 ("The Board then had to confront the disconnect between the Company's long-range plan and the deal price. The solution was to slash the Company's projections, and Company's management proceeded to do just that."). There is "no rule that precludes management or its financial advisor from using alternative sets of financial projections in evaluating the advisability and fairness of

[282] Compl. ¶¶ 80, 104.

[283] *See* Viela Schedule 14D-9 at 16–17.

95

a merger. Indeed, given the unpredictability of the future, it is common for companies to have multiple sets of projections based on different assumptions about what will transpire going forward." *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *5 (Del. Ch. Dec. 18, 2009).[284] The Complaint does not plead facts to suggest that the October Projections did not reflect management's "'best estimate of [Viela's] future cash flows.'" *Simonetti*, 2008 WL 5048692, at *10 (quoting *In re Netsmart Techs. Inc., S'holders Litig.*, 924 A.2d 171, 203 (Del. Ch. 2007)).[285]

---

[284] In *3Com*, the company disclosed both the earlier and later sets of financial projections in its proxy statement. 2009 WL 5173804, at *4–5. But that does not mean that multiple sets of financial projections must always be disclosed. "Even in a cash-out transaction, when stockholders are comparing cash on the table to their stock's potential upside, not every projection is material." *Kihm*, 2021 WL 3883875, at *14; *see also Goldstein*, 2022 WL 1671006, at *27 (noting that the "duty of disclosure depends on the facts and circumstances" and directors do not "always have a duty [to] disclose every set of projections and describe the changes that mark each iteration"). Directors do not have an obligation to disclose unreliable, speculative, or outdated information to stockholders. *See Arnold*, 650 A.2d at 1280; *PNB*, 2006 WL 2403999, at *18 (observing that the disclosure of "outdated and unreliable" financial projections would not have significantly altered the total mix of information available to stockholders); *Simonetti*, 2008 WL 5048692, at *10 (concluding that the plaintiff failed to "meet its burden of showing how disclosing lower-probability projections would have been considered material by the reasonable stockholder," but granting preliminary injunctive relief due to other disclosure deficiencies in the proxy statement); *Goodwin v. Live Ent., Inc.*, 1999 WL 64265, at *13 (Del. Ch. Jan. 25, 1999) (explaining that "an overly optimistic disclosure" may render a disclosure document "less, not more, reliable"), *aff'd*, 714 A.2d 16 (Del. 1999) (TABLE).

[285] The court in *Netsmart* granted a preliminary injunction and required the company to disclose additional financial projections. 924 A.2d at 203, 210. The court, however, found the company's proxy statement to be deficient because it did not disclose the final financial projections relied on by the company's financial adviser in preparing its fairness opinion, *not* because it failed to disclose an earlier set of management projections as Plaintiff alleges here. *Id.* at 202–03.

In sum, the circumstances surrounding the creation of the October Projections do not cast doubt on their reliability and do not support a reasonable inference that the June Projections were material. Although including the optimistic June Projections, which predated Viela's launch of UPLIZNA, in the Section 14D-9—and then explaining why they were not relied upon—may have provided a somewhat fuller picture, it is not reasonably conceivable that such additional disclosures would have been material to a reasonable stockholder.

### 4. Yao's compensation discussions with Horizon management

Plaintiff next challenges the disclosure surrounding Yao's retention and compensation-related discussions with Horizon. Plaintiff alleges that the Schedule 14D-9 failed to disclose that Yao "personally discussed" with Walbert the anticipated retention of Viela's executive management team post-acquisition, Horizon's intention to give all Viela employees a welcome equity grant, and Horizon's intention to accelerate management's unvested options as part of the Merger.[286] Plaintiff alleges this information was material. The Director Defendants argue that the Schedule 14D-9 contains the material information regarding Yao's retention and compensation-related discussions with Horizon.[287]

---

[286] Compl. ¶ 125; *see also* Hr'g Tr. at 58:1–15 (Pl.'s Counsel).

[287] *See* Director Defs.' Opening Br. 32–35; Director Defs.' Reply Br. 13.

The Schedule 14D-9 disclosed information about the employment arrangements between Horizon and Viela's employees, including Yao. The Schedule 14D-9 stated:

> In considering the recommendation of the Board to tender Company Shares in the Offer, stockholders should be aware that the *Company's executive officers, members of the Board and affiliates may be considered to have interests* in the execution and delivery of the Merger Agreement and all of the Transactions, including the Offer and the Merger, that *may be different from or in addition to those of the Company's stockholders generally*.[288]

These interests include: (1) "the accelerated vesting of Company Stock Options"; (2) "the receipt of payments and benefits by certain executive officers of enhanced severance benefits"; (3) increases in the "base salaries" and "annual bonus compensation" of executive employees; and (4) payment of base salaries and annual bonus compensation to continuing employees no less than the compensation they would have received in the 12-month period following the effective time of the Merger.[289]

The Schedule 14D-9 also disclosed the accelerated vesting of Company options and Horizon's grant of equity awards to Viela's employees. For instance, the Schedule 14D-9 stated that "Dr. Yao, Dr. Drappa and Mr. Chan will also receive *accelerated vesting of any unvested options* held by them at the Effective Time that

---

[288] Viela Schedule 14D-9 at 4 (emphasis added).

[289] *Id.*

98

would otherwise vest in accordance with their ordinary vesting terms on or before June 1, 2021[.]"[290] With respect to the employee equity grants, the Schedule 14D-9 reported that "[Horizon] has committed to grant to certain Continuing Employees an equity award under the Equity Incentive Plan and/or any [Horizon] equity incentive plan."[291]

In addition, the Schedule 14D-9 disclosed Yao's specific employment arrangement with Horizon. It stated: "Following the execution of the Merger Agreement, [Horizon] has offered to Dr. Yao a consulting agreement, the effectiveness of which is conditioned on the consummation of the Merger."[292] Pursuant to the consulting agreement, Yao would "support [Horizon's] research and development programs and the integration of [Viela] into [Horizon]" for a $50,000 monthly consulting fee.[293] As to the other members of Viela's management team, the Schedule 14D-9 disclosed that they may "enter into new compensation arrangements with [Horizon]," and such arrangements "would be entered into after the completion of the Offer and would become effective after the Merger is completed, if at all."[294]

---

[290] *Id.* at 11 (emphasis added).

[291] *Id.*

[292] *Id.* at 12.

[293] *Id.*

[294] *Id.*

The circumstances here are not, as Plaintiff asserts, comparable to those in *Mindbody*, 2020 WL 5870084.[295]  In *Mindbody*, the plaintiff alleged that Richard Stollmeyer, the company's CEO and chairman, focused on one bidder, Vista Equity Partners ("Vista") during the company's sale process and refused to share information with certain bidders that he "did not want to work with."  *Id.* at *21. Prior to receiving Vista's offer, Stollmeyer had interacted privately on numerous occasions with Vista representatives, including to discuss his post-transaction employment.  *See id.* at *28.  Mindbody's amended proxy statement represented that "Vista and [Mindbody] had not discussed the terms of post-closing employment or equity participation for Mindbody management," which the plaintiff alleged was materially misleading.  *Id.* at *27 (alteration in original).  The court concluded that a reasonable stockholder would have considered information about Stollmeyer's post-closing employment discussions to be material because it would have "shed light on the depth of [Stollmeyer's] commitment to the acquirer," his "personal economic incentives," and his "reluctance to consider bids from other prospective purchasers."  *Id.* at *27 (internal quotation marks omitted).

Here, the Complaint's allegations as to Yao do not rise to the level of those asserted against Stollmeyer in *Mindbody*.  Although Horizon did offer Yao a post-

---

[295] Pl.'s Answering Br. 102–03.

closing consulting agreement, there are no well-pleaded allegations in the Complaint that Yao "influenced the negotiations and ultimate terms" of the Merger for his self-interest. *Id.* at \*28 (internal quotation marks omitted). The Schedule 14D-9 also disclosed information about Yao's consulting agreement and post-transaction compensation.[296] "'Fully informed' does not mean indefinitely informed." *Merge Healthcare*, 2017 WL 395981, at \*9. A board of directors is not obligated to disclose "[c]onsistent and redundant facts" or "insignificant details and reasonable assumptions." *In re OM Gp., Inc. S'holders Litig.*, 2016 WL 5929951, at \*11 (Del. Ch. Oct. 12, 2016) (alteration in original). Given the Schedule 14D-9's factual disclosures, information about Yao and Walbert's discussions may have been "somewhat more informative," but it would not have significantly altered the "total mix" of available information regarding the post-Merger compensation of Velia's management. *Volcano*, 143 A.3d at 749 (internal quotation marks omitted).

Having determined that the Complaint lacks well-pleaded allegations to support a reasonable inference that AstraZeneca was Viela's controlling stockholder, or that the Schedule 14D-9 was materially misleading or contained material omissions, "the only claim that Plaintiff[] could state that would overcome the otherwise irrebuttable application of the business judgment rule is a claim for

---

[296] Viela Schedule 14D-9 at 12.

waste." *Larkin*, 2016 WL 4485447, at *21 (citing *Volcano*, 143 A.3d at 750); *see also Rouse Props.*, 2018 WL 1226015, at *25. The Complaint does not do so here. Thus, the fiduciary duty claims against the Director Defendants must also be dismissed. *Volcano*, 143 A.3d at 750.

## III. CONCLUSION

For the foregoing reasons, the court concludes that the Complaint does not allege facts that support a reasonable pleadings-stage inference that AstraZeneca was Viela's controlling stockholder at the time of the Merger. Therefore, it is not reasonable to infer that AstraZeneca owed fiduciary duties to Plaintiff or Viela's stockholders, and AstraZeneca's motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6) is granted. The claims against the Director Defendants for breach of fiduciary duty must also be dismissed because the Merger is subject to cleansing under *Corwin,* and the Complaint does not plead a claim for waste. Accordingly, the Complaint is dismissed with prejudice.